NOTICE
Decision filed 11/14/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190377

NO. 5-19-0377

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 18-CF-1120 |
| | ) | |
| CORTEZ WILSON, | ) | Honorable |
| | ) | John J. O'Gara, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court, with opinion.
Justices Cates and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1 The defendant, Cortez Wilson, appeals his convictions for aggravated battery (720 ILCS 5/12-3.05(a)(4), (c) (West 2016)). He argues that he was prejudiced by the substitution of a juror after deliberations had begun where the original jurors had already voted and signed verdict forms before the substitution, where there was a significant disparity in the length of deliberations before and after the substitution, and where the alternate juror was not questioned before rejoining the jury nearly five hours away from the court. We reverse the defendant's convictions and remand for a new trial.

¶ 2                                   I. BACKGROUND

¶ 3 The events at issue occurred on July 19, 2018, at the Community Interfaith Food Pantry, a nonprofit organization that provides food for people in need in Belleville and nearby communities.

1

An altercation took place during which the defendant struck two other individuals in the face—the organization's 62-year-old executive director, Michael Foppe, and Roscoe McCoy, a volunteer. As a result, McCoy suffered minor injuries, and Foppe permanently lost vision in his left eye.

¶ 4     The State filed an information charging the defendant with four counts of aggravated battery. Count I and count II alleged that the defendant struck Foppe in the face, thereby causing great bodily harm (count I) and permanent disability (count II) to an individual who was 60 years of age or older. See 720 ILCS 5/12-3.05(a)(4) (West 2016). Count III alleged that the defendant struck Foppe in the face in a place of public accommodation. *Id.* § 12-3.05(c). Count IV alleged that the defendant struck McCoy in the face on a public way. *Id.* The charges in counts I and II are Class 2 felonies. *Id.* § 12-3.05(h). The charges in counts III and IV are Class 3 felonies. *Id.*

¶ 5     In March 2019, the defendant provided notice of his intent to raise the affirmative defense of self-defense. The State then sought to admit evidence of three prior criminal convictions for purposes of impeaching the defendant's testimony at trial. The court granted the State's request with respect to only one of the defendant's prior convictions—a 2012 conviction for domestic battery.

¶ 6     The matter came for trial in November 2019. Foppe testified about events leading up to the incident at issue. He stated that the first time he recalled seeing the defendant at the food pantry was July 17, 2018, two days before the incident. On that day, the defendant received one week's worth of food. The following afternoon, July 18, at around 3 p.m., when the pantry was about to close, the defendant returned, requesting more food. Foppe told the defendant that he would have to return in 30 days and asked him to leave the premises. At trial, Foppe explained that the clients could receive 7 days' worth of food once every 30 days. He testified that the defendant refused to

2

leave when asked. Foppe stated that he had to escort the defendant to the door "[a]t least four or five times." The defendant eventually left, but he lingered outside the building.

¶ 7    The following day, July 19, 2018, was a Thursday. Foppe testified that the food pantry is closed to the public on Thursdays. At approximately 10 in the morning, however, Foppe saw the defendant at the delivery door to the warehouse. Foppe testified that he went to the alarm system and hit the "panic button." He explained that this caused the building's alarm to sound and also alerted the security company, which in turn called the police. Foppe stated that after pushing the panic button, he went back to the warehouse and informed the defendant that he had called the police. He also told the defendant to leave the premises. In addition, Foppe instructed the volunteers working in the warehouse not to give the defendant the items he had requested. He explained that it was policy not to give out items when the food pantry was closed to the public.

¶ 8    Foppe next described the defendant's reaction to being asked to leave. According to Foppe, the defendant said, "You punk-a*** b***," and then hit Foppe in the chest. This occurred inside the delivery area of the warehouse. Foppe stated that he did not place his hands on the defendant at any point.

¶ 9    Foppe testified that after the confrontation inside the warehouse, he and another volunteer escorted the defendant out to the parking lot. There, the defendant struck Foppe in his left eye with his right hand. Foppe stated, that "it felt like a cue ball" had struck him. He acknowledged, however, that he did not see any object in the defendant's hand. As a result of the incident, Foppe lost sight in his left eye.

¶ 10    Food pantry volunteer McCoy also testified about the events of July 19, 2018. He explained that even though the food pantry was closed to the public that morning, the delivery door was open to allow deliveries to be brought in and to provide ventilation in the warehouse on a hot day. An

3

individual McCoy identified as the defendant came into the warehouse and requested hand sanitizer and a bottle of water. McCoy testified that Foppe pushed the panic button, causing the alarm to sound, and then told the defendant that he needed to leave the premises and that the police would arrive in 30 seconds. According to McCoy, the defendant became belligerent. He cursed at Foppe and remained inside the warehouse.

¶ 11    McCoy testified that Foppe escorted the defendant to the parking lot. He further testified that the defendant shoved Foppe, and the two men then "grabbed each other." McCoy later clarified that the shoving began inside the warehouse and continued outside in the parking lot. McCoy saw the defendant's arm come forward, after which Foppe screamed and retreated. Foppe then asked someone to call 9-1-1, saying that he needed an ambulance. McCoy thought that the defendant threw something at Foppe. He explained that he "heard like a skipping of maybe a rock on the asphalt." He testified, however, that he did not see the defendant pick up a rock or other object.

¶ 12    McCoy testified that Foppe and the other volunteers went inside, while he remained outside to see where the defendant went. He explained that he wanted to be able to tell the police where the defendant was when they arrived. McCoy further testified that the defendant initially began walking away from the scene. However, he turned around, approached McCoy, and asked, "Why are you following me?" McCoy stated that he told the defendant he was not following him and that he just wanted to be sure he left the premises. At this point, the defendant accused McCoy of trying to trip him. McCoy turned away, at which point the defendant struck him on the right side of his jaw. McCoy testified that he was on the sidewalk when the defendant struck him. Although McCoy had a sore jaw and some scratches on his neck, he did not suffer severe or permanent injuries.

4

¶ 13    Shelter volunteer James Donovan was inside the building stocking canned goods in a room located next to the warehouse when the incident at issue began. At trial, he testified that he heard the alarm go off, and he walked to the warehouse. Finding no one there, he continued through the delivery doors to the parking lot. There, he saw Foppe, McCoy, and a third volunteer walking an individual toward the public sidewalk. Donovan identified the individual as the defendant. He testified that Foppe pulled back, turned around, and "cried out in pain" while grabbing his face. Donovan testified that he did not hear anything that sounded like a rock hitting the ground and did not see any object flying in his direction. He further testified that he did not see the incident between the defendant and McCoy, although he testified that he remained outside the warehouse attempting to keep the defendant within his line of sight until the police arrived.

¶ 14    Michael Orbst, the owner of an automotive shop across the street from the food pantry, testified that, on the morning of July 19, 2018, he heard a commotion at the food pantry. When he looked to see what was happening, he saw Foppe and McCoy, both of whom he recognized, with an individual he identified as the defendant. Although he did not see the defendant strike Foppe, he did see the defendant move his arm in a manner that looked like he was either punching Foppe or throwing something at him. Orbst testified that Foppe then screamed loudly and held his head. Orbst further testified that he saw the defendant punch McCoy. However, he did not provide any details.

¶ 15    Much of the defendant's testimony was similar to the accounts given by the State's witnesses, although it differed in key respects. He testified that he passed the food pantry while he was walking to his aunt's house. He thought it was open because he could see that the garage doors to the warehouse were open and that people were working inside. The defendant testified that he

5

continued on to his aunt's house, where he intended to pick up some of the food he had received from the food pantry and to ask his aunt for a drink of water. However, his aunt was not home.

¶ 16    The defendant testified that he returned to the food pantry and asked two volunteers for water and hand sanitizer. He stated that the volunteers said they would get these items for him and told him to wait outside. However, Foppe stopped the two volunteers from getting the items for the defendant. According to the defendant, Foppe then "got in [his] face" and pushed him. The defendant testified that Foppe told him to leave. He acknowledged that Foppe also told him that he had been asked to leave multiple times but that he kept coming back. According to the defendant, he asked Foppe if he had done anything to anyone at the food pantry, but Foppe did not answer.

¶ 17    The defendant testified that Foppe told him he was going to activate the alarm and call the police. Although the defendant initially testified that he told Foppe to "go ahead" because he wanted to tell the police what had happened, he testified that he walked away. According to the defendant, as he walked away, he could see two volunteers attempting to restrain Foppe. However, Foppe got away from them and ran toward him. The defendant acknowledged that at this point, he struck Foppe with his fist. He stated that he did so because he was afraid Foppe was going to hurt him. He explained that Foppe was larger than him and that he had already shoved the defendant while they were next to the warehouse.

¶ 18    The defendant next testified that one of the pantry volunteers tried to grab him, but he kept walking. He admitted that he picked up some rocks from a flower bed, approached McCoy, and "got in his face." He further admitted that he told McCoy that "maybe" he should hit McCoy, but he denied actually striking him. When asked what happened to the rocks he picked up, the defendant said that he threw them on the ground.

6

¶ 19    On cross-examination, the defendant admitted that he told police he was "jumped" by Foppe, McCoy, and one other person. Although he acknowledged that he was not "jumped," he stated Foppe shoved him and that all three tried to "put their hands on" him.

¶ 20    After trial, the jury went to the jury room to begin its deliberations at 10:48 a.m. The court asked William Raby, the alternate juror, to remain in the courtroom for additional instructions. The court informed Raby that he would receive a phone call once the jury reached a verdict. The court instructed him not to discuss "any subject connected with this case" with anyone until that time. The court further instructed Raby not to read or listen to any news accounts involving the case, not to conduct any independent research or investigation, and not to form an opinion regarding the defendant's guilt or innocence "until or unless" Raby was "actually asked to come back here and deliberate with the other jurors." Raby was then permitted to leave.

¶ 21    At 11:36 a.m., the court received the following note from the jurors: "By 'knowingly caused permanent disability' to Michael Foppe, does that mean (1) knowingly hit him, which caused the permanent disability, or (2) knowingly caused the permanent disability?" Counsel for both parties agreed that the jury should be told to continue reviewing the instructions it had been given, which were sufficient to decide the issues before them.

¶ 22    At 1:20 p.m., the court received another note from the jury, asking, "Can you please simply define the word 'knowingly'?" The parties again agreed that the court should tell the jurors to review the instructions they had been given.

¶ 23    At 1:30 p.m., the court received a note from the jury asking if the word "knowingly" was "equal to" the word "intent." The court noted that although jurors had been given an instruction defining "knowingly," they had not been given a definition of the word "intent." The judge asked counsel whether he should provide jurors with a definition of "intent." Both parties agreed that

7

providing the definition would not be proper, although the State argued that it would be proper to tell jurors that "knowing" and "intent" do not mean the same thing. The court again told the jurors that they had been given all the instructions they needed.

¶ 24    At 2:14 p.m., the court reconvened outside the presence of the jury. The judge stated, "I've been instructed *** that, apparently, the jurors were—usually they don't bring phones with them into the deliberation room. But they all have phones." The judge also noted that one of the jurors had sent him a note asking to be excused early to pick his son up from daycare.

¶ 25    Bailiff Wendell Vaughn was called to testify under oath at the court's request. He stated that 10 of the 12 jurors had cell phones. Juror Connie Stanley admitted to Vaughn that she used her phone to look up a word related to the case. Vaughn testified that another juror used his phone to try to make arrangements to pick up his child from daycare, and a third juror used his phone to play solitaire during deliberations. Vaughn did not know whether Stanley communicated anything to the other jurors concerning the word she looked up.

¶ 26    The parties and the court agreed that the jurors should be questioned individually. Defense counsel indicated that he would move for a mistrial if any of them said that Stanley had shared information with them. At 2:29 p.m., after the jury had been deliberating for 3 hours and 41 minutes, the bailiff returned to the jury room to tell the jurors to stop deliberating. The jurors were then questioned in open court one by one.

¶ 27    Juror Terris Gully was asked if he knew anything about another juror using her phone to look up a word. He replied, "I really stopped paying attention." He noted that he was "kind of getting mad." We note that Gully is the juror who used his phone to attempt to make arrangements for someone to pick up his child at daycare. Gully further stated that the other jurors "all had their phones out."

8

¶ 28    Juror Shaquita Hicks stated that another juror looked up the word "knowingly" but did not show the other jurors what she found. The court asked Hicks, "Did they actually quote from what they found out on their phone?" Hicks replied, "Yes, 'knowingly' and 'intent' and also 'possibility.' That's what they said they kind of saw." The court asked, "She must have looked up three words?" Hicks responded, "No, she looked up 'knowingly' and *** like what other words could be used for 'knowingly.' " Defense counsel inquired, "When you said that she—referring to looking at the words, did she provide a definition, her own definition then of 'knowingly?' " In response, Hicks indicated that the juror was still confused and did not provide a definition. We note that Hicks was not asked to clarify her statements further. However, Stanley herself was later questioned and indicated that the bailiff took her phone from her before she could find an answer.

¶ 29    The court questioned the remaining jurors other than Stanley. Each indicated that Stanley looked up the word "knowingly." Each stated that they did not hear her discuss what, if anything, she found with the other jurors. One juror noted that the bailiff took Stanley's phone from her very quickly, and she did not know if Stanley was able to find a definition. Each juror indicated that the jury did not discuss anything related to Stanley's search.

¶ 30    After all the jurors except Stanley had been questioned, the State argued that the appropriate remedy would be to dismiss Stanley for cause, substitute the alternate juror, and instruct the jurors to begin their deliberations anew. Defense counsel stated, "I'm inclined to agree with the State. I believe I'm satisfied with the polling of the jurors and that there was no tainting of the jurors done by any outside information."

¶ 31    The court reminded Stanley that she had received an explicit instruction not to conduct her own research and informed her that she might be held in contempt of court for defying this instruction. Stanley admitted that she tried to look up a word related to the case. However, as

mentioned earlier, she stated that the bailiff took her phone before she was able to look at a definition.

¶ 32     After Stanley left, the remaining 11 jurors were brought back into the courtroom. The judge instructed them to suspend their deliberations until the alternate juror arrived. The court then stated, "When he gets here, you're required to begin your deliberations from the beginning ***. *** You are being ordered at this point to begin your deliberations as if you had just gone back there." The court told the jurors that they would be able to take a break for a meal, which would be provided to them.

¶ 33     The court began to dismiss the jurors for their meal, but one juror asked, "What do we do with the old verdict forms? Some of them are signed." The court informed the jurors that the used verdict forms would be destroyed and that the jury would be supplied with clean verdict forms. The court then dismissed the jurors and recessed.

¶ 34     The record indicates that at 3:44 p.m., all jurors, including the alternate, went to the jury room to begin their deliberations. There is no indication that the court questioned Raby about any exposure to outside information during the five hours he was away from the courtroom and no indication that defense counsel had an opportunity to question him. At 4:10 p.m., the court reconvened because the jury had reached a verdict. The jury foreman announced a verdict of guilty on all four charges, and the jurors were polled. The court dismissed the jurors and indicated that the verdict forms signed by the original jury would be kept under seal rather than being destroyed.

¶ 35     The defendant filed a motion for a new trial, which the court denied. The court subsequently sentenced the defendant to consecutive sentences of 7 years in prison on count I and 30 months of probation on count IV. The court found that count II and count III merged with count I and did not enter sentences on those charges. This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    The defendant argues that he was prejudiced by the substitution of a juror under the facts

of this case, thereby depriving him of his right to be tried by a fair and impartial jury. He

acknowledges that the issue was not preserved for appellate review because counsel agreed to the

substitution and did not raise the issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176,

186 (1988). However, he urges us to consider his claim under the plain error rule. That rule allows

us to review forfeited claims (1) when the evidence is so closely balanced that the error threatened

to tip the scales against the defendant or (2) when the error is so egregious that it undermined the

fairness of the trial and the integrity of the judicial system. *People v. Herron*, 215 Ill. 2d 167, 186-

87 (2005). The defendant argues that review of his claim is proper under either prong of the plain

error rule. Alternatively, he argues that counsel's failure to request a mistrial constituted ineffective

assistance of counsel.

¶ 38    The State argues that even plain error review is foreclosed by the invited error doctrine.

Under that doctrine, a party that affirmatively acquiesces to a procedure followed by the trial court

cannot later challenge that procedure on appeal. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 73.

The State contends that counsel's statement expressly agreeing to the replacement of Stanley with

Raby invited the procedure the defendant now challenges. The State correctly points out that

invited error "goes beyond mere" forfeiture and acts as a form of estoppel precluding appellate

review of even plain errors. See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004).

¶ 39    In response, the defendant argues that (1) counsel's acquiescence to the substitution of a

juror should not be considered invited error because it was the State that continually argued in

11

favor of substitution;[1] (2) while the invited error doctrine precludes first-prong plain error review, it should not preclude review under the second prong of the plain error rule; and (3) even if counsel is deemed to have invited the error by agreeing to the substitution initially, he cannot be deemed to have agreed to everything that came after his statement. In addition, the defendant correctly notes that review of claims of ineffective assistance of counsel is not precluded by the invited error doctrine. See *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001) (considering a defendant's claim of ineffective assistance of counsel after finding the invited error doctrine to be applicable).

¶ 40    We need not consider all of the defendant's arguments concerning the applicability of the invited error doctrine. We agree with his contention that defense counsel cannot be deemed to have invited any error that occurred after he agreed to the substitution. As we will explain, many of the factors pertinent to our decision occurred or came to light after defense counsel initially agreed to the substitution of alternate juror Raby. As such, we need not consider the remaining arguments about the applicability of the invited error doctrine or the defendant's claim of ineffective assistance of counsel. We need only consider whether plain error occurred.

¶ 41    The first step in plain error analysis under either prong of the plain error rule is to determine whether an error occurred at all. See *Cox*, 2017 IL App (1st) 151536, ¶ 52. Without error, there can be no plain error. *Id.* ¶ 87. With this in mind, we turn our attention to the merits of the defendant's contentions.

---

[1]We note that courts have drawn a distinction between "active participation in the direction of the proceedings" and a mere failure to bring the issue to the trial court's attention. *Harvey*, 211 Ill. 2d at 385. However, the applicability of the invited error doctrine does *not* depend upon whether a party requests an action rather than expressly acquiescing to it. See, *e.g.*, *id.* at 381, 398 (finding the invited error doctrine applicable where defense counsel in one case expressly agreed to—but did not request—the trial court's decision to allow "mere fact" impeachment of the defendant); *Cox*, 2017 IL App (1st) 151536, ¶¶ 74-76 (finding the invited error doctrine applicable where defense counsel repeatedly stated that he had "no objection" to the admissibility of evidence).

12

¶ 42    The seminal case addressing the issue before us is *People v. Roberts*, 214 Ill. 2d 106 (2005). There, the Illinois Supreme Court held that the decision to substitute an alternate juror after deliberations begin is a matter within the discretion of the trial court. *Id.* at 121. The court recognized, however, that substitution once jury deliberations have begun "involves substantial potential for prejudice." *Id.* at 123-24. Therefore, a trial court must "take significant precautions to avoid prejudice before allowing substitution." *Id.* at 124.

¶ 43    In considering whether the trial court abused its discretion in allowing the substitution of a juror after deliberations began, the primary question before this court is whether the defendant was prejudiced as a result. See *id.* at 121 (explaining that the potential for prejudice must be our "primary consideration"). Relevant factors include (1) whether the alternate juror and any of the remaining original jurors were exposed to prejudicial outside information or influences, (2) whether the original jurors formed opinions regarding the case before the substitution, (3) whether the court instructed the reconstituted jury to begin its deliberations anew, (4) any indications that the jurors failed to follow instructions, and (5) the length of time jurors deliberated before and after the substitution. *Id.* at 124. We consider the totality of the circumstances. *Id.*

¶ 44    In this case, the 11 remaining jurors were questioned on their exposure to the outside information Stanley attempted to find. Most said unequivocally that they did not hear what, if any, information Stanley found online. As the defendant points out, Shaquita Hicks's statements on the matter were somewhat vague and could be interpreted to mean that Stanley stated aloud that she had learned that the words "intent" and "possibility" could be used interchangeably with the word "knowingly." However, because Stanley stated that the bailiff took her phone before she was able to obtain any information, we believe the record establishes that the remaining jurors were not exposed to outside information related to the case.

13

¶ 45    We cannot reach the same conclusion with respect to the alternate juror, Raby, however. Raby left the court at 10:48 a.m. and returned to join the remaining jurors at 3:44 p.m. Thus, he was away from the court for a period of just under five hours. Upon his return, the court did not question him concerning any exposure to outside information or influences during this extended period, and there is no indication that defense counsel had an opportunity to do so.

¶ 46    We recognize that the court properly instructed Raby not to discuss the case or read any information about it until he received a phone call informing him that the jury had reached a verdict. Ordinarily, we presume that jurors follow the instructions they have been given. See *People v. Birge*, 2021 IL 125644, ¶ 40. However, there exists a real possibility for unintentional exposure to outside information or influence when an alternate juror is away from the controlled environment of the courthouse for an extended period. Due to the substantial potential for prejudice inherently involved in substitutions of jurors during deliberations, our supreme court has held that trial courts must "take *significant* precautions to avoid prejudice." (Emphasis added.) *Roberts*, 214 Ill. 2d at 123-24. Questioning an alternate juror upon his or her return to court is an important step for the trial court to take and an important consideration for this court. See, *e.g.*, *id.* at 125 (considering the court's failure to question the alternate juror upon her return, among other considerations, in finding the substitution was prejudicial to the defendant); *People v. Carrilalez*, 2012 IL App (1st) 102687, ¶ 43 (finding the substitution did not prejudice the defendant where the alternate juror confirmed to the court that she had not discussed the case, formed an opinion, or been exposed to outside information before joining the remaining original jurors); *People v. Hayes*, 319 Ill. App. 3d 810, 818 (2001) (finding no prejudice where the alternate juror confirmed to the court that he did not discuss the case or form an opinion and where counsel had an opportunity to question him further). Here, the court failed to do so.

14

¶ 47    Turning to the second *Roberts* factor, the record reveals that the original jurors reached conclusions and signed verdict forms with respect to three of the four charges before they were told to stop deliberations. See *Roberts*, 214 Ill. 2d at 124. The *Roberts* court found it significant that the original jurors had "formed and declared" their opinions when they voted twice before the substitution. See *id.* at 125. Turning to the third factor, although there is no indication the court instructed the reconstituted jury to begin deliberations anew, the court did provide this instruction to the 11 remaining original jurors before they were dismissed for lunch, and the court also told Raby that the jury was to begin its deliberations anew if he were asked to return. See *id.* at 124.

¶ 48    We next consider the fourth *Roberts* factor, whether there are any indications that jurors failed to follow the court's instructions. See *id.* While there was no indication that any of the jurors other than Stanley directly refused to follow specific instructions, there are indications that multiple jurors had allowed themselves to be distracted from the "faithful performance of their duties" as jurors. See Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000). One juror admitted that he had stopped paying attention to the discussions, and another juror was playing video games on his phone. In *Roberts*, our supreme court found that the failure of jurors to report violations of instructions "may be indicative of a lack of appreciation for their responsibility as jurors." *Roberts*, 214 Ill. 2d at 125 (citing *People v. Jones*, 105 Ill. 2d 342, 352 (1985)). We believe similar reasoning applies here. While the use of cell phones during deliberations, standing alone, may not have been sufficient to require reversal, this conduct at least gives an indication that some of the jurors may not have fully appreciated their duty to begin deliberations anew.

¶ 49    Finally, we consider the amount of time jurors spent deliberating both before and after the substitution. As discussed previously, the original jury deliberated for 3 hours and 41 minutes

15

before the substitution while the reconstituted jury deliberated for at most 26 minutes before reaching verdicts. Substantial disparities between the time spent deliberating before and after the substitution can be a strong indication that the original jurors, having already formed opinions, did not, in fact, begin their deliberations anew when joined by Raby. See, *e.g.*, *United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975).

¶ 50    The State contends, however, that the disparity in the length of deliberations before and after the substitution is merely one factor and is not dispositive. See *Roberts*, 214 Ill. 2d at 124 (explaining that we must consider the totality of the circumstances); *Carrilalez*, 2012 IL App (1st) 102687, ¶ 49 (rejecting a defendant's claim that shorter deliberations after the substitution established that the reconstituted jury failed to follow the court's instruction to begin deliberating anew under the facts of that case). The State also points out that the jury sent its first note to the court asking for clarification concerning the definition of the word "knowingly" after deliberating for 48 minutes. The State posits that this indicates that the original jury likely took only 48 minutes to reach its verdicts on three of the four charges.

¶ 51    We agree with the State that the disparity in the length of deliberations before and after the substitution is not dispositive standing alone. However, we reject the State's overall argument concerning this factor for two reasons. First, we have no basis to make the assumption the State asks us to make. We do not know—and cannot know—in what order the original jurors discussed the four charges.

¶ 52    Second, and more fundamentally, as we explained earlier, our determination depends on the totality of the circumstances. Here, one of the jurors stated on the record that he was getting angry and had stopped paying attention to the deliberations. Significantly, as we have already discussed at length, the original jurors had already signed verdict forms declaring their opinions

16

with respect to three of the four charges. When considered in light of these facts, the disparity in the length of deliberations before and after the substitution raises serious questions as to whether the original jurors were truly willing and able to begin their deliberations anew or whether Raby felt pressure to agree to a conclusion the others had already reached. Considering the five *Roberts* factors and the totality of the circumstances, we believe the defendant was prejudiced by the substitution and the court, therefore, abused its discretion.

¶ 53    We note that the key factors underlying our conclusion are the court's failure to question Raby before allowing him to rejoin the jury and the coercive environment suggested by the fact that the jurors had already signed verdict forms coupled with the disparity in the length of deliberations before and after the substitution. As we stated earlier, these factors all either occurred or came to light after defense counsel agreed to the substitution. For this reason, we find the invited error doctrine inapplicable.

¶ 54    As the defendant acknowledges, however, the error was not properly preserved for review. Defense counsel did not move for a mistrial or ask the court to revisit the decision to substitute Raby for Stanley when it was revealed that the original jury had signed three verdict forms, and he did not raise the issue in the defendant's posttrial motion. Therefore, we must now consider whether review is proper under either prong of the plain error doctrine.

¶ 55    As we noted earlier, plain error review is appropriate under two circumstances: (1) where the evidence is so closely balanced that the error alone threatened to tip the scales against the defendant, or (2) where the error is so fundamental that it undermined the fairness of the defendant's trial and the integrity of the judicial process. See *Herron*, 215 Ill. 2d at 186-87. Although we do not agree with the defendant that the evidence was closely balanced, we find that review is proper under the second prong of the plain error doctrine.

17

¶ 56 As the defendant points out, our supreme court has repeatedly held that an error resulting in a biased jury would constitute the type of "structural error" that is subject to review under the second prong of the plain error rule. See *People v. Sebby*, 2017 IL 119445, ¶ 52; *People v. Thompson*, 238 Ill. 2d 598, 610-11 (2010). In addition, errors that impede a jury's ability to deliberate freely and appropriately are subject to second-prong plain error review. See *People v. Cavitt*, 2021 IL App (2d) 170149-B, ¶ 60, *appeal denied*, No. 127264 (Ill. Sept. 29, 2021). Here, the substitution of a juror after the original jurors had formed and declared their opinions created a strong likelihood that the alternative juror would enter a coercive environment, and the court failed to take precautions to ensure that the alternate juror had not been exposed to any improper outside information during his five hours away from the court. Under these circumstances, we conclude that second-prong plain error occurred. As such, we must reverse the defendant's conviction and remand for a new trial.

¶ 57 Finally, we note that the defendant raises additional issues. He argues that the court erred in admitting evidence of his prior conviction for aggravated battery for purposes of impeachment, and he argues that the court abused its discretion in failing to discharge other jurors for cause along with Stanley. Because we reverse and remand for a new trial, we need not address these claims.

¶ 58                                    III. CONCLUSION

¶ 59 For the foregoing reasons, we reverse the defendant's conviction and remand for a new trial.

¶ 60 Reversed and remanded.

*People v. Wilson*, 2022 IL App (5th) 190377

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, No. 18-CF-1120; the Hon. John J. O'Gara, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Kyle P. Smith, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | James A. Gomric, State's Attorney, of Belleville (Patrick Delfino, Patrick D. Daly, and Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |