2023 IL App (2d) 220213-U
No. 2-22-0213
Order filed May 11, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-1692 |
| ARTHUR R. PANKNIN, | ) ) ) | Honorable D. Christopher Lombardo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court's failure to comply with Supreme Court Rule 431(b)'s *voir dire* requirements was not plain error because the evidence supporting defendant's convictions was not closely balanced and there was no indication that the jury was biased because of the violation. (2) The trial court did not bar defendant from recross-examination of the victim and, even if it did, the error was not plain error because the evidence was not closely balanced and recross-examination of the victim was not vital, as redirect examination did not raise any new matters.

¶ 2    Defendant, Arthur R. Panknin, appeals from his convictions of aggravated domestic battery based on strangulation (720 ILCS 5/12-3.3(a-5) (West 2020)) and unlawful restraint (720 ILCS 5/10-3(a) (West 2020)). He contends that the trial court committed plain error when it (1) failed

to follow up with a juror about her negative response to the *Zehr* propositions (see *People v. Zehr*, 103 Ill. 2d 472, 477 (1984)) and (2) denied defendant an opportunity to conduct recross-examination of the victim, Veronica Hamil. We hold that (1) the trial court erred in its *Zehr* inquiry, yet the error was not plain error, and (2) the court did not deny defendant recross-examination. Thus, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4      Defendant was indicted on one count of aggravated domestic battery based on his having strangled Hamil (720 ILCS 5/12-3.3(a-5) (West 2020)) and one count of unlawful restraint having detained Hamil (720 ILCS 5/10-3(a) (West 2020)). He opted for a jury trial.

¶ 5      During jury selection, the trial court advised the potential jurors that it would read them four legal propositions and then ask the jurors individually if they understood and accepted each proposition. See *Zehr*, 103 Ill. 2d at 476-77; see also Ill. S. Ct. R. 431(b) (eff. July 1, 2012) (codifying *Zehr*'s holding that the trial court must ask prospective jurors if they accept certain propositions about the burden of proof in criminal cases and the defendant's right against self-incrimination). The court then read twice to the venire each of the following propositions (couched as questions): (1) "do you understand and accept that the Defendant is presumed innocent of the charges against him?", (2) "do you understand and accept that before a Defendant can be convicted the State [must] prove the Defendant guilty beyond a reasonable doubt[?]", (3) "do you understand and accept that the Defendant is not required to offer any evidence on his own behalf[?]", and (4) "do you understand and accept that if the Defendant does not testify it cannot be held against him[?]". The court then advised the potential jurors that it would ask each of them if they understood and accepted all four propositions and that they could answer either yes or no.

¶ 6    When the trial court asked juror 163 if she understood and accepted the four propositions, she answered no.  The court did not ask for a reason.  When juror 120 answered no, the court asked her if she answered no "[f]or the reasons [she] ha[d] stated earlier[.]"[1]  Juror 120 replied yes.  When jurors 184 and 187 answered no, the court did not ask either juror for a reason.

¶ 7    The trial court then conducted a *voir dire* examination of each potential juror.  The court asked juror 163 if there was anything about her husband's work experience that would prevent her from being fair.  She answered no.  The court also asked her if her children's work would affect her ability to hear the case, and she answered that she did not believe so.  The court further asked juror 163 if there was anything that it did not ask her that would be "noteworthy for the attorneys or the Court[.]"  She said she did not believe so.  She answered yes when the court asked if she could be fair and impartial.  The court still did not ask her about her negative response to the *Zehr* propositions.

¶ 8    After a recess, the trial court found that, because jurors 120, 184, and 187 expressed significant issues with the nature of the charges, those jurors could not be fair and impartial.  The court asked if the attorneys wanted the court to explore the issue further with those jurors.  Both defense counsel and the State agreed that no further questioning was necessary and that all three jurors should be removed for cause.

¶ 9    The trial court then allowed the attorneys to question the remaining potential jurors.  The State asked juror 163[2] several questions about her background but did not ask her about her

---

[1]Juror 120 had earlier said that she would have difficulty being impartial in the case, because her sister had been a victim of domestic violence.

[2]Although the record states that juror 162 was being questioned, the parties agree that, in

negative response to the four *Zehr* propositions. Defense counsel did not question juror 163 before accepting her. The State also accepted juror 163.

¶ 10    The trial revealed the following facts. At about 6 p.m. on November 4, 2021, the Fox Lake Police Department received a 911 call. A woman, who identified herself as Hamil's and defendant's neighbor, said that Hamil had reported that defendant had beaten her and placed zip ties on her wrists. Hamil then came on the call and stated that defendant had zip-tied her hands and choked her three times. Hamil also said defendant told her he would choke and kill her. Hamil told the dispatcher that she had almost died.

¶ 11    Sergeant Richard Howell and Officer Joshua Lisenby of the Fox Lake Police Department were dispatched to Hamil's location. Upon arriving, Howell saw Hamil outside a house with a zip tie around her left wrist and two more hanging from that zip tie like a chain. Hamil was very upset and had redness around her neck and upper chest. Lisenby removed the zip ties from Hamil's left wrist. According to Howell, Hamil told him that she and defendant had argued. During the argument, defendant "choked her to where *** she blacked out three times, and then zip tied her hands[.]" When she regained consciousness, he brought her outside. Hamil did not tell Howell that she had agreed to be zip-tied. Howell then went to defendant's house across the street and spoke to defendant, who was inside an enclosed front porch. He described defendant as emotional, angry, and uncooperative. Defendant said that Hamil had attacked him with a golf club and that he had removed the zip tie from Hamil's right wrist before he escorted her out of the house. When Howell asked defendant to step outside and talk, defendant refused. According to Lisenby,

_____

fact, juror 163 was being questioned. Based on her responses, we agree that the record misidentified juror 163 as 162.

defendant had no visible redness, cuts, scratches, bite marks, or bruises on his face. He had only old injuries on his arms.

¶ 12     When Howell and Lisenby told defendant that they had probable cause to arrest him, defendant retreated farther into the house's interior, slammed the door, and told the officers to get a warrant. As Lisenby talked further with Hamil, he saw defendant exit a side door and run toward Forest Avenue. Lisenby and Howell chased defendant, saw him walking on Forest Avenue, and arrested him. Defendant did not struggle when arrested. Howell transported defendant to the police station. Howell also did not see any fresh scratches, bruises, redness, or bite marks on defendant's body.

¶ 13     At the police station, defendant waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and spoke to Howell and Lisenby. During the interview, defendant said that he had put Hamil in a rear-naked chokehold. Lisenby, who had practiced martial arts for several years, testified that a rear-naked chokehold is performed by approaching the victim from the rear and placing one's arm around the neck of the victim so that the forearm is against one side of the neck and the bicep against the other. The purpose of the chokehold is to apply pressure and cut off blood flow in both carotid arteries, causing the victim to pass out in less than 10 seconds.

¶ 14     On cross-examination, Lisenby testified that he never saw defendant apply the rear-naked chokehold and did not know if defendant even knew how to apply it. He admitted that defendant showed him old injuries on his body that he claimed Hamil had inflicted. Defendant also told Lisenby that he had cut one of the zip ties on Hamil's wrist and had not chased her once she left the house.

¶ 15     Hamil testified that she and defendant had been living together in defendant's rental house since July 2021. On November 1, 2021, defendant became very angry after reading several text

messages on Hamil's phone. Defendant asked Hamil to move out, but she had nowhere to go. Hamil spent one night with one of defendant's friends. Defendant then said that she could move back in but that he would divide the house into two areas. There was an interior wall with a barn door that defendant locked to create two separate living spaces. The kitchen, a bathroom, and a bedroom were on Hamil's side. Although she had a toothbrush and a change of clothes, her other personal belongings remained on defendant's side of the house, to which he denied her access.

¶ 16    On the evening of November 2 or 3, 2021, Hamil could hear defendant and a female having sex in defendant's side of the house. That angered Hamil.

¶ 17    On November 4, 2021, Hamil attended court in Woodstock. Afterward, she texted defendant and asked if she could retrieve her personal belongings from his side of the house, and he said yes. After arriving at the house, Hamil tried to open the interior door to access defendant's side of the house, but it remained locked. She then banged on the interior door but got no response. Finally, she went to the rear of the house and began banging on the exterior door. Hamill was "frustrated and fed up" and decided just to get her belongings and leave.

¶ 18    Hamil saw her golf clubs on the rear patio, so she grabbed a club from the bag and reentered the front of the house. When she heard defendant on his side of the house, she used the golf club to pry open the interior door. She then entered defendant's area. Hamil started screaming and flailing her arms. She swung the club once at defendant but missed him, and the club flew out of her hands. Hamil testified that she "had so much hatred built up towards [defendant]" over the previous few days. At one point, defendant put her in a bear hug from behind to stop her from hurting him or hurting herself by hitting him (she explained that she had "a bad left arm"). She then started screaming, scratching, kicking, and trying to pull away. Defendant asked her numerous times to calm down. According to Hamil, defendant asked her if he could zip-tie her

wrists so that she would not hurt herself. Hamil denied that defendant was hitting or forcefully grabbing her to hurt her. Hamil knew that "[she] wasn't going to stop[ ]" with her physical outburst. After defendant put zip ties on her wrists, she calmed down momentarily. She then "freaked out again" and bit defendant, so he took her to the floor. Because Hamil kept flailing and fighting, defendant lay on her back so that she could move only her legs. As he was lying on her, defendant "put his arm around [her] throat to *** grab *** [her] mouth so [she] would stop screaming." She recalled biting him, and then everything became a "blur to [her] from exhaustion and screaming *** so much." She did not know if she lost consciousness from (1) falling asleep, (2) passing out from being worn out, or (3) holding her breath to escape the situation. Defendant then got up, picked her up, and helped her to the front door. He opened it for her, and she ran across the street to a neighbor's house.

¶ 19    Hamil's neighbor was outside and called 911. Hamil told the dispatcher that defendant was going to kill her and had choked her three times. Hamil later gave a written statement to the police in which she said that defendant had choked her, bound her hands with zip ties, and said that he was going to kill her. Hamil never told the police that defendant was trying to protect her or that she had hit defendant.

¶ 20    On cross-examination, Hamil testified that, on November 1, 2021, when defendant saw the text messages on her phone, he physically forced her out of the house and would not allow her to return. She called the police, asking if they could help her get her belongings, but they refused to help. Later, defendant allowed her to return, but only if he physically divided the house. She agreed to return because she had nowhere else to go. She admitted that, although the house was divided, she was free to come and go from the house.

¶ 21    Hamil testified further on cross-examination that, on November 4, 2021, she yelled and told defendant that she was coming through the interior door to get her belongings. After prying the door open, she swung the club once at defendant but did not hit him. She broke a glass picture frame, sending broken glass to the floor. Defendant tried not to get hit by the club or Hamil's fists, and he protected himself by trying to "hold [her] down[.]" When asked if she was the "initial aggressor," Hamil answered, "I was furious, yes." The bear hug was very tight, and defendant told her at least a dozen times to calm down. Defendant told her that he would let her go if she agreed to have her hands zip-tied. She agreed, and defendant zip-tied her hands in front of her. Hamil calmed down momentarily, but, when she saw another woman's personal items in defendant's bedroom, she began to hit defendant again. They were wrestling, and Hamil was screaming loudly. They fell to the floor, and defendant put his arm around Hamil's neck. Defendant told her to "shut the f*** up." After about 30 seconds, Hamil calmed down because of the pressure on her back and chest. Defendant then escorted her out of the house.

¶ 22    In March 2022, Hamil met with a victim coordinator and the prosecutor. At that time, she reported that she had used a golf club to pry open the interior door and had swung the club at defendant. According to Hamil, her trial testimony was the truthful version, "[w]ithout emotion[.]"

¶ 23    On redirect examination, the State asked Hamil what "[she] g[ot] to decide in terms of anything in [her] relationship" with defendant. She replied that she was allowed to decorate the house and decide "[s]mall things for the relationship—dinner, going out, and doing things like that." Defendant would ask her opinion on matters, and "typically [her] opinion was chosen." However, she had no choice about dividing the house or having no access to her clothing and other personal items. When asked if defendant had choked her, she answered that it was partly true. She admitted that she feared for her safety and her life on the night of the incident. She also

admitted that, at one point that night, defendant's arm was around her neck and she could not breathe. Although she felt like she would pass out from being unable to breathe, she did not know if that was from defendant choking her or her holding her breath. She explained, "When I get upset I hold my breath to pass out so I'm not at that place anymore."

¶ 24    After concluding redirect, the prosecutor stated that she had nothing further. The trial court then told Hamil she could step down and thanked her. The court then released the jury for the day. When the court asked the attorneys if there was anything else, the prosecutor said, "Just the exhibits." Defense counsel then stated, "I am not going to recross."[3] The court responded, "No, you are not." Defense counsel replied, "No, I mean—[.]" The court interjected, "We are not doing that. No. Okay."

---

[3]After defendant filed his brief, the State filed a motion to correct the record on appeal, alleging as follows. The original record on appeal contained a discrepancy as to what defense counsel said about recross. The record contained two transcripts of the April 12, 2022, proceeding—one full, the other partial. The full transcript reflected defense counsel saying, "I have not had recross." The partial transcript read, "I am not going to recross." After noticing the conflict, the appellate prosecutor contacted the assistant state's attorney who handled the case. The latter, in turn, contacted the court reporter. Attached to the State's motion was an affidavit from the court reporter confirming that the partial transcript was the accurate version. The State asked to file a corrected transcript, noting that it had confirmed that the appellate defender did not oppose the motion. We granted the motion, and the State filed a supplemental transcript of the April 12, 2022, proceeding. That transcript reflected defense stating, "I am not going to recross."

¶ 25    The jury found defendant guilty of both counts.  The trial court denied defendant's posttrial motion and sentenced him to concurrent prison terms of three years on count I and two years on count II.  Defendant, in turn, filed this timely appeal.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, defendant contends that the trial court committed reversible error when it (1) failed to follow up with juror 163 about her negative response to the *Zehr* propositions and (2) denied defendant an opportunity to conduct recross-examination of Hamil.   Defendant, recognizing that trial counsel failed to object to either alleged error, asserts that both are reviewable as plain error.   The State initially responds that defense counsel acquiesced in the procedure involving juror 163, and, thus, under the invited-error doctrine, defendant waived any claim of error.   Alternatively, the State posits that neither error was plain because there was no clear and obvious error and, if there was, the evidence was not closely balanced.

¶ 28    We begin with the State's contention that the issue regarding juror 163 is waived because defense counsel invited the error.  We disagree.

¶ 29    Under the invited-error doctrine, when a party affirmatively acquiesces to the trial court's actions, any potential claim of error on appeal, including plain error, is waived.  *People v. Wilson*, 2022 IL App (5th) 190377, ¶ 38.  In *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 32, a case relied on by the State, the appellate court held that defense counsel invited the error regarding the *Zehr* propositions by answering yes when the trial court asked if the jury had been properly admonished regarding *Zehr*.  However, this case is distinguishable from *McGuire* because here the trial court never asked defense counsel if he agreed with the court's *Zehr* procedure.  Nor did defense counsel otherwise affirmatively agree with the court's questioning of juror 163.  At most,

defense counsel merely failed to object. Thus, the invited-error doctrine does not bar defendant's argument on appeal.

¶ 30　We next address whether the trial court committed plain error in its *Zehr*-related questioning of juror 163. The plain-error rule is a narrow and limited exception to forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010); see Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

> "[T]he plain error rule allows reviewing courts discretion to review forfeited errors under two alternative prongs: (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."
>
> *People v. Moon,* 2022 IL 125959, ¶ 20.

Under either prong, the burden of persuasion remains with the defendant. *Moon*, 2022 IL 125959, ¶ 20.

¶ 31　The first step in applying the plain-error rule is to determine whether any error occurred. *Moon*, 2022 IL 125959, ¶ 22. Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires a trial court to ask prospective jurors if they understand and accept that (1) the defendant is presumed innocent, (2) the State must prove the defendant guilty beyond a reasonable doubt, (3) the defendant is not required to offer any evidence in his own behalf, and (4) the defendant's decision not to testify on his own behalf cannot be held against him. Rule 431(b) further provides that the trial court shall allow each juror to respond to specific questions concerning the propositions set forth under that rule. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Rule 431(b) codifies *Zehr*'s holding

that imposed specific *voir dire* requirements on the trial court (see *Zehr*, 103 Ill. 2d at 477). *People v. Brown*, 2017 IL App (1st) 142197, ¶ 33.

¶ 32 Here, the trial court properly admonished the jurors regarding the four *Zehr* propositions and then asked each juror if the juror understood and accepted those propositions. However, when juror 163 answered no, the court did not follow up by asking her why she did not understand and accept all of the propositions. Although the State points to the trial court's additional questioning of juror 163, that questioning addressed merely whether juror 163 could be fair and impartial. The court did not ask juror 163 why she said no when asked if she understood and accepted the *Zehr* propositions. The failure to follow up with juror 163 after she answered no was error. Thus, we next address whether that error was plain error.

¶ 33 A failure to comply with Rule 431(b) is not an automatic basis for reversal under the second prong (*i.e.*, the serious-error prong) of the plain-error rule. *People v. Birge*, 2021 IL 125644, ¶ 24. To obtain relief under the second prong, the defendant must produce evidence that the Rule 431(b) violation produced a biased jury. *People v. Sebby*, 2017 IL 119445, ¶ 52. Defendant has produced no such proof here.

¶ 34 We proceed to the first prong (*i.e.*, the closely-balanced-evidence prong) of the plain-error rule. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Our inquiry involves an assessment of the evidence as to the elements of the charged offenses, along with any evidence regarding the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 35 Here, defendant was charged with aggravated domestic battery based on strangulation (720 ILCS 5/12-3.3(a-5) (West 2020)) and unlawful restraint (720 ILCS 5/10-3(a) (West 2020)). To

prove the aggravated-domestic-battery charge, the State was required to prove that defendant committed a domestic battery (720 ILCS 5/12-3.2(a) (West 2020)) by strangling Hamil. For purposes of subsection (a-5) of the aggravated-domestic-battery statute, " 'strangle' means intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." 720 ILCS 5/12-3.3(a-5) (West 2020). To prove unlawful restraint, the State needed to prove that defendant knowingly and without legal authority detained Hamil. 720 ILCS 5/10-3(a) (West 2020).

¶ 36     Further, defendant raised the affirmative defense of self-defense. Thus, the State had the burden of proving beyond a reasonable doubt both the elements of the offenses *and* that defendant did not act in self-defense. See *People v. Gray*, 2017 IL 120958, ¶ 50. Self-defense requires the following elements: (1) unlawful force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the defendant actually and subjectively believed a danger existed that required the use of the force applied, and (6) the defendant's beliefs were objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50. If the State negates any one of those elements, self-defense necessarily fails. *Gray*, 2017 IL 120958, ¶ 50.

¶ 37     Here, Hamil testified that the door was locked when she tried to enter defendant's side of the house to obtain her personal belongings. After defendant refused to open the door and let Hamil in, she obtained one of her golf clubs and pried the door open. She admitted she was angry with defendant for preventing her from accessing her belongings *and* for having had a woman in his bedroom a night or two before. When Hamil encountered defendant, she swung the club once at him and missed. The club flew out of her hands, and she did not swing it again. Hamil and

defendant then engaged in a fight in which Hamil swung her hands at defendant and tried to bite and scratch him. Defendant tried to control Hamil by bear-hugging her and lying on top of her. He put his arm around her neck at one point, causing her to partially lose consciousness. He told the police that he used a rear-naked chokehold, which Lisenby explained is designed to cut off the blood flow to the brain. When defendant choked Hamil in that fashion, she passed out momentarily. Although Hamil's trial testimony was, in some respects, inconsistent with her prior statements to the police, she did testify that defendant put his arm around her neck to stop her from screaming and that she lost consciousness. Thus, the evidence was not closely balanced as to the aggravated-domestic-battery charge.

¶ 38    Although defendant contended at trial that he choked Hamil in self-defense, the evidence does not show that he choked her to prevent her from harming him. Rather, he did so to prevent Hamil from screaming. Thus, the evidence was not closely balanced on the issue of whether the State negated an essential element of self-defense (*i.e.*, the danger of imminent harm) as to the aggravated-domestic-battery charge.

¶ 39    As for the unlawful-restraint charge, Hamil testified that defendant zip-tied her hands together. Although she claimed at trial that he did so just to protect her from hurting herself, her written statement to the police reported that defendant choked her, zip-tied her hands, and said he was going to kill her. Also, Howell testified that Hamil told him that defendant choked her until she blacked out and then zip-tied her hands. Hamil never mentioned to the police that she had attacked defendant, that he zip-tied her hands to protect her, or that she agreed to have her hands zip-tied. Thus, the evidence was not closely balanced on the charge of unlawful restraint.

¶ 40    Nor was the evidence close on the issue of self-defense as it applied to unlawful restraint. As noted, Hamil told police that defendant zip-tied her hands after choking her until she was

unconscious. Hamil did not tell the police she was a threat to herself or defendant when he zip-tied her. Moreover, Hamil testified on cross-examination that defendant had her in a tight bear hug before zip-tying her hands. The evidence clearly established that Hamil was not a threat to defendant when he zip-tied her. Thus, the evidence negating self-defense as to unlawful restraint was not closely balanced.

¶ 41    Defendant asserts, however, that the evidence was closely balanced because of Hamil's questionable credibility. However, although some aspects of her testimony were not entirely consistent with her prior statements to the police, much of her testimony was. Indeed, she testified that defendant zip-tied her hands only after she was effectively subdued. Afterward, he choked her until she passed out. Moreover, this case did not turn exclusively on Hamil's credibility. Defendant admitted to the police that he placed Hamil in a rear-naked chokehold. Further, both officers testified that they did not observe any fresh injuries on defendant. In contrast, both officers saw redness on Hamil's neck and upper chest. Additionally, defendant tried to avoid arrest by fleeing from the house. That was evidence of consciousness of guilt. See *People v. Harris*, 225 Ill. 2d 1, 23 (2007). Thus, evidence in addition to Hamil's testimony showed that defendant committed both offenses.

¶ 42    We conclude that the evidence, properly viewed in its totality from a commonsense perspective, was not closely balanced on the elements of either the offenses or self-defense. Accordingly, the trial court's error in applying Rule 431(b) was not plain error and is not reversible.

¶ 43    We next address whether the trial court committed plain error in denying defendant an opportunity to conduct recross-examination of Hamil. As discussed, for there to be plain error, there must first be error. See *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 44   The scope and extent of cross-examination and recross-examination are within the trial court's discretion. *People v. Graves*, 2012 IL App (4th) 110536, ¶ 16. Accordingly, we will reverse the trial court's denial of recross-examination only if it abuses its discretion. See *Graves*, 2012 IL App (4th) 110536, ¶ 16. An abuse of discretion occurs when the trial court's ruling is unreasonable. *People v. DePaolo*, 317 Ill. App. 3d 301, 308 (2000). Where new evidence is introduced on redirect examination, the opposing party must be allowed to recross on the new matter. *People v. Garner*, 2018 IL App (5th) 150236, ¶ 24. Further, a blanket policy of not allowing recross-examination can be plain error. See *Garner*, 2018 IL App (5th) 150236, ¶ 22.

¶ 45   Here, no error occurred. Although the original record indicated that the court did deny defendant an opportunity to conduct recross-examination, the corrected record tells a much different story. Specifically, after the State conducted redirect examination of Hamil, defense counsel stated unequivocally that he would not conduct any recross-examination. The trial court's comments ("No, you are not." and "We are not doing that. No. Okay.") were merely an acknowledgment of defense counsel's decision to forgo recross-examination. Defendant asserts that the court had a blanket policy of denying recross-examination, but the record simply does not show that. Rather, defense counsel's statement that he was not going to conduct any recross was spontaneous and not in response to any suggestion by the court that it would not allow recross under any circumstances. Accordingly, this case is distinguishable from *Garner*, wherein defense counsel asked for recross-examination, and the court stated that redirect examination was final because the State " 'g[ot] [the] last shot' " at its own witnesses. *Garner*, 2018 IL App (5th) 150236, ¶ 9. Here, there was simply no indication from the trial court that it had a blanket policy barring recross-examination. Thus, no error, let alone plain error, occurred.

¶ 46 Finally, even if the trial court erred in denying defendant an opportunity to conduct recross-examination of Hamil, the error was not cognizable as plain error under either prong of the plain-error rule. As discussed, the evidence was not closely balanced.

¶ 47 Nor did any error satisfy the second prong of the plain-error rule. Where a defendant claims second-prong plain error, we must decide whether the error was so serious that it affected the trial's fairness and challenged the judicial process's integrity. See *Sebby*, 2017 IL 119445, ¶ 50. Although the right to confront witnesses, including the right to cross-examine them, is fundamental (*People v. Knight*, 323 Ill. App. 3d 1117, 1125 (2001)), a trial court may, as a matter of discretion, limit the scope of cross-examination (*People v. Stokes*, 392 Ill. App. 3d 335, 340 (2009)). Here, as discussed, there was no indication that the trial court had a blanket policy of denying recross-examination. Further, even if the court abused its discretion in denying recross, that error did not affect the trial's fairness and integrity. The questioning of Hamil on redirect examination regarding defendant's control over her did not garner significantly incriminating evidence. Further, what evidence it did produce was not particularly material in showing that defendant committed either aggravated domestic battery or unlawful restraint as charged. Also, Hamil's testimony about defendant's violent conduct and her fear for her safety did not introduce any matter not previously elicited in her testimony. Thus, even if the court erred in denying defendant the opportunity to recross Hamil, the error was nowhere near the magnitude required under the second prong of the plain-error rule.

¶ 48                                    III. CONCLUSION

¶ 49 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 50 Affirmed.