2024 IL App (2d) 230136-U
No. 2-23-0136
Order filed November 13, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-244 |
| NATHAN H. RIGG, | ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in admitting the minor victim's prior statements under section 115-10 of the Code of Criminal Procedure of 1963; the trial court did not err in allowing the investigating officer to provide limited background testimony regarding the minor victim sitting for a victim sensitive interview; and double jeopardy did not attach. However, trial counsel was ineffective for failing to object to a defective jury instruction regarding the elements of the offense, and the trial court's blanket ban on recross-examination was an abuse of discretion. Reversed and remanded.

¶ 2    Defendant Nathan H. Rigg appeals his conviction of two counts of predatory criminal sexual assault of a child for which he was sentenced to 18 years' imprisonment. For the following reasons we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4      On April 29, 2021, Defendant was charged via amended indictment with three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) (counts I-III) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2018)) (count IV) based on allegations that defendant made inappropriate contact with his daughter, A.S. who was four years old at the time of the alleged offenses. Defendant and A.S.'s mother were divorced with A.S.'s mother having primary custody.

¶ 5      On April 15, 2021, prior to defendant's first trial, the court heard motions *in limine* regarding the admissibility as hearsay exceptions of certain out of court statements by A.S. The trial court's ruling on these issues was not relitigated during defendant's second trial and is therefore pertinent to our summary of the second trial. We review the motions *infra* ¶¶ 8-25.

¶ 6      The matter proceeded to a bench trial, and on February 18, 2022, the trial court entered an order finding defendant not guilty of counts I and IV—which alleged defendant made contact with A.S.'s vagina and anus for the purposes of sexual gratification—and finding defendant guilty of counts II and III—which alleged defendant placed his fingers inside A.S.'s vagina and anus.

¶ 7      On March 18, 2022, defendant filed a motion to reconsider the finding of guilty or in the alternative a new trial, in which he alleged that he received ineffective assistance of counsel based in part on ineffective cross-examination of Laura S., A.S.'s grandmother. The trial court granted defendant's motion for a new trial on May 12, 2022, vacating the guilty finding on counts II and III. The matter proceeded to a jury trial beginning August 29, 2022.

¶ 8                                A. Motions *in Limine*

¶ 9      The State presented three motions *in limine*. The first sought to admit five statements made by A.S. as hearsay exceptions under section 115-10 of the Code of Criminal Procedure of 1963

(Code) (725 ILCS 5/115-10 (West 2020)). These included: 1) a statement made to Laura S. on December 22, 2019, stating, "Grandma, my dad hurt me very bad in my privates[;]" 2) a statement made to Laura S. on February 5, 2020, stating, "[t]his is how daddy would put his finger in my butt and vagina[;]" 3) a statement made to Elizabeth Synove, a registered nurse at Mercy Health Hospital, on December 22, 2019, that, "daddy touched my privates[;]" 4) statements made to Anna Krause during a victim sensitive interview at the Child Advocacy Center (CAC); and 5) a statements made to Katie Maki, A.S.'s teacher. The other two motions sought to admit the December 22, 2019, statement made to Laura S. as an excited utterance under Illinois Rule of Evidence 803(2) (eff. Sept. 28, 2018), and sought to admit the December 22, 2019, statement to Synove as a statement made by a victim of a sex offense to medical personnel pursuant to section 115-13 of the Code (725 ILCS 5/115-13 (West 2020)).

¶ 10    At the hearing, Laura S., Synove, and Maki each testified regarding the statements A.S. made to them. Further, recordings of two interviews between Krause and A.S. were published to the trial court. The recordings were dated July 17, 2019, and January 2, 2020.

¶ 11    In the July 17, 2019, interview, A.S. was asked to identify body parts on a drawing of a girl. She identified the "butt" and "boobs," but said it was hard to identify the area of the drawing depicting the vagina, describing it only as "part of the leg[.]" A.S. mentioned a game she and defendant played with her vagina, but did not give any further explanation of what the game was.

¶ 12    In the January 2, 2020, interview, Krause first spent around six minutes asking A.S. about her day and what toys she had gotten for Christmas. Krause then asked what A.S.'s mother had told her about why she was at the interview, and the following exchange occurred:

"Krause: What did mom say about coming here today?

> A.S.: She said I'm here to see you about—Because the last time I was here I didn't tell the truth.
>
> Krause: Oh no. Tell me about that.
>
> A.S.: My daddy actually touched me.
>
> Krause: OK. You said that the last time you didn't tell the truth. Tell me about not telling the truth.
>
> A.S. Because, you know what? My dad did touch me in a bad way.
>
> Krause: Can you tell me about it—yeah OK—Tell me about—"

A.S. then went on to describe how defendant would touch or pinch her "vagina." She said that this had happened 10 times, and that it had happened on defendant's living room couch and in his bedroom. She also described defendant using a squirt gun on her vagina and said, "he likes going down my butthole." A.S. correctly identified the area of the vagina and "butthole" on an anatomical drawing.

¶ 13    Regarding the statements made to Laura, she testified that on December 21, 2019, A.S. had gone to visit with defendant. On December 22, 2019, Paul S., Laura's husband, picked A.S. up from a visit with defendant and she arrived at Laura's home around 5:45 p.m. When Laura saw A.S. she was "in a daze." Shortly thereafter, A.S. began projectile vomiting in the living room. Laura brought A.S. upstairs to the bathtub and began undressing A.S. to get her cleaned up. A.S. continued to vomit. A.S. then began sobbing and told her, "grandma, my daddy hurt me very badly in my privates." Laura observed that A.S.'s labia and clitoris were red and inflamed. A.S. continued vomiting and Laura and her husband then took her to the hospital.

¶ 14    Laura then testified about a statement A.S. made on February 5, 2020. A.S. had just gotten out of the bath. According to Laura, "[A.S.] was laying on the floor on her hands and knees. Her

arms and her butt is in the air and she said, grandma, this is how—this is how my daddy would have me be naked when he would put his finger in my vagina and my butt." A.S. then asked if she would be in trouble for saying vagina, and Laura told her she would not be.

¶ 15    Synove worked as an emergency room nurse at Mercy Health Hospital and described her treatment of A.S. on December 22, 2019. A.S. had presented with vomiting and was in an exam room with her grandparents. Synove was in the process of triaging her and asked A.S. about her pain. A.S. told her, "daddy touched my privates." Synove had not previously asked A.S. about her father or anything of a sexual nature.

¶ 16    Maki was A.S.'s preschool teacher. Maki testified that in late 2019 she observed a change in A.S.'s behavior: "She started to become really impatient, really withdrawn, not engaging with peers, not engaging with teachers, just overall a huge change in behavior." In early February, A.S. told her, "my dad has been hurting me, I'm not going to dad's anymore, he has been pinching me and stuff, and I know it's wrong." They had not previously been discussing A.S.'s father or anything of a sexual nature. Around a week or week-and-a-half later, A.S. made another statement to Maki: "She had told me that she's so lucky that she has so many people that love her, but not her dad, he is mean to her and touches her private parts." Prior to this statement they had been discussing A.S.'s mother having surgery.

¶ 17    The court continued the matter to May 12, 2021, for argument, after which the trial court ruled as follows. Regarding the State's motion to admit testimony regarding A.S.'s December 22, 2019, statement to Laura as an excited utterance, the court found that the statement was made within one to one-and-a-half days from the alleged event, and within 45 minutes of arriving at Laura's home. The statement was made while A.S. was vomiting and did not stem from any coaching or attempts to elicit information from Laura. The trial court also noted that this was the

2024 IL App (2d) 230136-U

first or most immediate reaction with an adult A.S. had after being with defendant. As such, the court found that:

> "[B]ased upon the totality of the assessment, based upon the lack of any self-interest by the minor, based upon the nature of the event, *i.e.*, arriving home from the defendant's home or property, and then indicating the symptoms that were observed by grandma, based upon the mental and physical condition of the declarant, which in this instance is the minor, and accepting that the time of the event was the day before the return to grandma's home, the Court does find that the State has met the requisite criteria and the motion to admit the excited utterances as are set forth in the 803 motion will be granted."

¶ 18    Regarding A.S.'s statement to Synove, the trial court found the statement admissible as a statement made by a victim to medical personnel for purposes of medical diagnosis or treatment, stating:

> "The question was asked by the nurse to the minor whether she was having pain and the statement subsequently made to the nurse about what the origin of the pain was. Under those circumstances, the Court finds that it is appropriate to grant the motion to admit the statement made to medical personnel and that motion is likewise granted."

¶ 19    As for the motion to admit pursuant to section 115-10 of the Code, the trial court first considered the statements made to Laura on December 22, 2019. The trial court found that A.S.'s statement was spontaneous and "not the result of any suggestive adult intervention or language." The trial court noted that there was an assumption that the inciting incident occurred sometime on December 21, 2019, which was supported by Laura's observation of A.S.'s genitals but was not

definitive. As for A.S.'s mental state, the trial court noted that A.S. "sobbed and cried profusely[.]" The trial court found the statement to be reliable and granted the State's motion.

¶ 20     The trial court next considered A.S.'s February 5, 2020, statement to Laura. The trial court noted that if it was assumed that the abuse occurred on December 21, 2019, this statement was made about a month-and-a-half later. The trial court noted that the statement "was made after the minor started counseling which introduced third-party adult intervention." The trial court also noted that at the first CAC interview, A.S. did not use the word "vagina," then on December 22, 2019, she used the word "privates" when speaking with Laura and Synove. Then at the January 2, 2020, CAC interview and again on February 5, 2020, A.S. used the word "vagina." The trial court speculated that [A.S.] may have learned the word vagina during counseling, "[c]ertainly as of February 5 of 2020, the minor was undergoing counseling, and although it's not established by any testimony that was submitted, may have become exposed to that word during the counseling sessions."

¶ 21     However, the trial court found that there was no indication that Laura was questioning A.S. about defendant and that the statement was spontaneous. "[B]ased upon the totality of the circumstances, which, again, is giving due consideration to the fact that the minor suddenly was using the word vagina, which could suggest adult intervention, [the statement] nonetheless appear[s] to be reliable." The trial court granted the State's motion as to the February 5, 2020, statement to Laura.

¶ 22     Regarding the statements made to Krause in the January 2, 2020, CAC interview, the trial court found that there was no question that "Krause adhered to the appropriate protocols and procedures for conducting a CAC interview." However, the court took umbrage with the fact that, "one of the first things that the minor says is the last time she did not tell the truth." The trial court

found that at the age of four, A.S. was "too young to have a guilty conscience about not being honest." The trial court believed A.S. was told by someone that she did not tell the truth, stating, "[h]ow would the four-year-old minor know that she did not tell the truth unless she was questioned about what she said and told by someone that she did not tell the truth?"

¶ 23    The trial court again emphasized the fact that prior to the January 2, 2020, interview, A.S. had not used the word vagina:

"It was at this interview that the minor transitioned from privates to vagina. While there was testimony that the minor was undergoing counseling in the February 2020 time frame, it is not clear that she was undergoing counseling as of January 2nd, 2020. There is no explanation as to how or why the minor was suddenly using a term that was not used to grandma, the nurse, or during the first CAC interview five and a half months earlier.

Additionally, if the, quote, last time was not the truth, there are now two versions. One is presumably true and the other is presumably not.

The whole of these events compel a finding that the second statement, the January 2nd, 2020 statement made to CAC is not reliable, and the motion is denied as to that second CAC statement.

And to be clear, the Court finds it significant that when the minor appeared for the second CAC interview, the preface was that she did not tell the truth the first time and then proceeded to use the word vagina. Relative to the utilization of that word when she was describing to grandma on February 5 that this is how daddy puts his finger in my butt and my vagina, the minor had now been exposed to that term. And whether she understood it or not is consequential. It was now a term she was using for descriptive purposes, and, as already stated, on February 5 of 2020, the minor's statement from the evidence received

was not prompted and was spontaneous in terms of the situation that was taking place with grandma on that day."

¶ 24   Finally, the trial court considered the statements to Maki. Regarding A.S.'s first statement that defendant had pinched her, the trial court found that pinching did not describe conduct which was sexual in nature, and therefore fell outside the purview of section 115-10 of the Code.

¶ 25   Regarding the second statement to Maki that defendant "touches her privates[,]" the trial court stated that, "[t]he statement while coming, in the Court's assessment, after there was clear adult intervention either in the context of counseling or in the context of somebody telling this minor that she was not truthful during the July 2019 statement nonetheless was spontaneous and consistent with things that she has said to grandma and to the nurse." The trial court noted that there had been no discussion regarding defendant or anything of a sexual nature prior to the statement. The trial court concluded that, "[w]hile there are concerns of adult intervention, the whole of this statement as made to [Maki] is found reliable, and the statement as made by [Maki] purporting to be a statement by the minor is found appropriate for admission under 115-10 and the motion is granted in that regard."

¶ 26                                          B. Second Trial

¶ 27   The following evidence was produced at defendant's second trial, which began on August 29, 2022.

¶ 28   Detective David Sharp of the Woodstock Police Department testified as follows: On January 2, 2020, he received a report of an incident of child sex abuse from Williams Bay, Wisconsin. After receiving the report, he set up a forensic interview with the CAC. The interview was held that same day. Following the interview, Sharp met with A.S.'s family and started interviewing witnesses, including A.S.'s mother, grandparents, the medical staff who had

examined A.S., and defendant. Sharp met with defendant at the Woodstock police department on the afternoon of January 21, 2020. Defendant told Sharp that he had spent December 21, 2019, with A.S. at his parent's house, with whom he lived.

¶ 29     On cross-examination Sharp stated that he had only met with the family on A.S.'s mother's side, not her father's. He also stated that he spoke with a man named Randy Roewer, who was dating A.S.'s mother.

¶ 30     Defendant requested that A.S. undergo a competency exam prior to testifying. The trial court found that she was competent, and she testified as follows: She was six years old and lived in Wisconsin, but did not know which town. She was starting first grade in two days. When asked if she knew the difference between good and bad touches, A.S. answered yes. She gave an example of a good touch as a hug from a family member, and a bad touch as "somebody who touches your privates." When asked if she had another word for privates, she answered, "I don't think so." However, she went on to say that it was not ok for someone to touch her boobies, vagina, and butt. When asked if anyone had touched those parts, she answered "my dad." She then identified defendant as her dad.

¶ 31     A.S. lived with her grandparents, and used to visit her dad, but had not done so in two years. A.S. remembered going to the hospital with her grandparents, but when asked if she had talked with the people at the hospital about bad touches, she answered, "I don't think so."

¶ 32     When asked what parts of her body defendant had touched, she answered, "[m]y vagina and butt." When asked what defendant used to touch those body parts, she answered, "[h]is finger." When asked whether defendant touched the inside or outside of her vagina, A.S. answered that he touched the outside. When asked whether defendant touched the inside or outside of her butt, A.S. initially answered, "[t]ouching maybe inside[,]" but was interrupted by an objection from

defendant. The objection was overruled, and the question re-asked at which point A.S. said, "I think it was on the inside, but I don't really know if it was on the inside."

¶ 33    When asked if she could describe how defendant touched her, A.S. said, "I don't think so." Then when asked what it felt like, she responded, "I don't really remember what it felt like."

¶ 34    On cross-examination, A.S. was asked why she went to the hospital, and A.S. said that she was not feeling well, and had been puking and vomiting. She did not remember talking with anyone at the hospital. When asked if grandma had put her in a tub before going to the hospital, A.S. responded that she did not think so. A.S. could not remember where at defendant's house he had touched her, nor what she was wearing at the time. A.S. also described that when staying with her dad she slept in a room with her cousin in bunk beds. A baby also slept in that room. A.S. also described how she used to live with her mom and Randy.

¶ 35    On redirect examination, A.S. stated that none of the prosecutors nor her grandma had ever told her what to say.

¶ 36    Laura S. testified as follows: She lived with Paul, and A.S. Previously, A.S. would "occasionally" stay with her mother. Previously, defendant had visitations with A.S. on Wednesday from noon to 4 p.m. and every other weekend from 4 p.m. Friday to 4 p.m. Sunday.

¶ 37    At 9 a.m. on December 21, 2019, Paul dropped A.S. off at the Williams Bay police department, which is where custody exchanges with defendant took place. Paul picked A.S. up from the Williams Bay police department on December 22, 2019, at 4 p.m.

¶ 38    When Paul and A.S. returned home, Laura was sitting in the "great room" in her rocking chair. A.S. came into the room and sat down on the sectional across from Laura. A.S. was "transit" and "non-verbal." Laura asked her "what's up[,]" but A.S. did not respond. She was "lethargic, in a dead trance." A.S. eventually got up and walked over to Laura to sit in the rocking chair with

her. Before she got to the chair, A.S. projectile vomited all over Laura and the chair. Laura called for Paul to get a bucket. Laura then brought A.S. upstairs to the master bathroom.

¶ 39    A.S. vomited again once upstairs. Laura then began to run the bathtub and take off her and A.S.'s clothes. A.S. was crying. They got into the tub and Laura observed that A.S.'s vagina was red and her clitoris was swollen. A.S. then said, "grandma, my dad hurt me very badly in my privates." Laura testified that she had not previously discussed defendant or anything sexual in nature with A.S. A.S. continued vomiting around once every 10 to 15 minutes, and Laura and Paul took her to Mercy Walworth hospital.

¶ 40    At the hospital, they were placed in a private room in the emergency ward. Eventually a nurse came to the room. Laura spoke with the nurse about what A.S. had told her, but she could not recall if she did so before or after the nurse examined A.S. During the nurse's examination of A.S. neither she nor Paul interjected. A.S. did not undergo a sexual assault examination at Mercy Walworth.

¶ 41    A.S. was transferred to Mercy Devon Bay Hospital in Rockford via an ambulance. Laura rode with her in the ambulance. Nothing regarding defendant or sex was discussed. When they arrived at Mercy Devon Bay Hospital they were placed in a private room. Eventually a nurse and doctor entered the room, and the doctor examined A.S visually. A.S. did not undergo a MERIT (Medical Evaluation Response Initiative Team) exam. A.S. was released from the hospital around 5 a.m. and everyone returned home.

¶ 42    A.S. started attending counseling two times a week, beginning January 19, 2020. A.S.'s mother scheduled a MERIT exam for A.S., which Laura attended.

¶ 43    Following December 21, 2019, defendant no longer had visitation with A.S. Laura described A.S.'s demeanor prior to December 21, 2019, as happy. After that, A.S.'s demeanor

changed; she was "withdrawn," had a "dead stare," and had severe nightmares. A.S. began to flip the legs up of her Barbie dolls and to masturbate. Laura observed that A.S. would "take her hand and go across her vagina and masturbate back and forth" while in the bathtub and in bed.

¶ 44    Laura testified that on February 5, 2020, after A.S. had finished bathing, Laura entered the master bedroom where A.S. was supposed to be putting on her pajamas. Laura found A.S. in the corner behind the bed, and she observed that "[A.S.] had her butt in the air, naked, laying with her elbows on her hands and knees, her butt in the air and she had her finger in her butt." Laura asked A.S. what she was doing, and A.S. responded, "I'm showing you how my dad *** would make me be naked." A.S. also said, "this is how my dad would put his finger in my butt. I told you. I needed to show you[,]" and "that's the way he'd put his finger in my butt and vagina."

¶ 45    On cross-examination, Laura acknowledged that the previous Thursday in the court parking lot, she called defense counsel "sicko" as she walked with A.S. into the building. On recross Laura stated that she called defense counsel sicko because he had been "looking [her] up and down[.]"

¶ 46    Defense counsel requested recross-examination, to which the trial court responded, "[a]s you are cognizant, [defense counsel], it's not the Court's practice to allow recross-examination. I will relax that protocol this one time, but please be mindful in the future Court's position [*sic*]." Defense counsel then asked if Laura had told the nurse about the soreness on A.S.'s vagina and the trial court sustained the State's objection that the question was beyond the scope of the redirect examination. Defense counsel asked no further questions.

¶ 47    Elizabeth Synove testified as follows: She worked as a registered nurse at Mercy Walworth Hospital's emergency department. On December 22, 2019, she treated A.S. who was complaining of vomiting. Prior to treating A.S., her grandmother spoke with Synove. While

examining A.S., Synove asked if she was having any pain, and A.S. responded, "daddy touched my privates."

¶ 48    On cross-examination, Synove indicated that A.S.'s grandmother told her what A.S. had said in the bathtub. Synove did not recall being told about any redness on A.S.'s vagina, and did not make a note of such in A.S.'s chart.

¶ 49    On redirect examination, Synove testified that she did not examine A.S.'s vagina, as she was not a SANE (Sexual Assault Nurse Examiner) nurse.

¶ 50    Kati Maki testified as follows: She had been A.S.'s pre-school teacher at Washington Elementary. As of December 2019, she had been A.S.'s teacher for two to two-and-a-half-years. Maki observed a change in A.S.'s personality beginning in September 2019.

> "She started to become really withdrawn. She did not want to be around teachers, didn't want to be around students and she was kind of lashing out at us when we were asking her to do things that we knew she loved and enjoyed. Like arts and crafts, she yelled at the teacher because she didn't want to do it. Wouldn't really engage with teachers and students and did a complete 180 of what she was doing before."

This behavior lasted for six months or longer.

¶ 51    Maki described a conversation she had with A.S. in February 2020. Maki and A.S. were at one of the classroom's play centers. There were other students in the room, but not near Maki and A.S. A.S. said unprompted, "I am so lucky I have so many people that love and take care of me, but not my dad, he's mean to me and touches my private parts." Prior to this statement, they had been discussing A.S.'s mother having surgery. They had not been discussing anything of a sexual nature, nor had they been discussing defendant.

¶ 52    Shannon Krueger testified as follows: She was the director of the University of Illinois, College of Medicine's MERIT program. The MERIT program covers 13 northern Illinois counties, and it provides medical examinations for children suspected to have been physically or sexually abused or neglected. Krueger described the process of a MERIT exam, which included educating the children about the terms "vagina, penis, and butt" to make sure it is clear what everyone is talking about. The examination involves a visual examination of the genitals.

¶ 53    Krueger performed a MERIT examination of A.S. in January 2020. A.S.'s grandmother brought her to the examination, but A.S. did not want her in the room for the exam. During her examination she did not observe any injuries or markings on A.S.'s body. Krueger explained that between 95 and 98% of children who disclose sexual abuse, including penetration, have "normal" examinations. Following the examination, Krueger recommended that A.S. continue counseling.

¶ 54    Krueger explained that pre-school aged children will have a "process disclosure" regarding sexual abuse in which they "test the waters much like they do in getting in trouble." They gauge an adult's response and may continue disclosure if they feel safe. Occasionally, a child might not say anything for weeks or months before further disclosing abuse.

¶ 55    On cross-examination, Krueger was shown her report of A.S.'s exam which indicated that A.S. had requested that Laura attend the examination. Krueger also testified that a normal examination neither indicated nor precluded sexual abuse.

¶ 56    On redirect Krueger testified that she had no concerns about A.S. being coached during her merit examination. Defense counsel requested recross-examination but was denied. Defendant later asked that his objection to being denied recross examination be made part of the record, to which the court responded,

"Objection is placed on the record. Court made it very clear on the first occasion when you asked this does [*sic*] Court engage in recross-examination. You were admonished at that juncture that it was not accepted by the Court. When you asked a second time, your request was denied for that reason, but your objection is denied."

¶ 57    The State rested.

¶ 58    Defense called Doctor Corbin Barwegen who testified as follows. Barwegen was a board-certified physician in emergency medicine. On December 22, 2019, Barwegen examined A.S. at Javon Bea Hospital. Prior to examining A.S. Barwegen spoke with A.S. and her grandparents about A.S.'s symptoms and medical history. A.S.'s grandmother reported that A.S. had redness around her vagina. Barwegen examined A.S. in a "frog position." He did not recall conducting a standing examination of A.S. Barwegen did not note anything abnormal in his examination of A.S.'s vagina. A.S. had a fever of 100.9. A.S. vomited during her visit and Barwegen gave her Soffrin. A.S. vomited again and she was given IV fluids. Barwegen believed that the vomiting was caused by viral gastroenteritis. He placed A.S. under observation for six hours and she was released.

¶ 59    Defense recalled Detective Sharp, who testified that defendant was not arrested until March 2020.

¶ 60    Defense rested and a jury instruction conference was held. The State offered Illinois Patten Jury Instructions, Criminal, No. 11.65E, formulated as, "[t]he term sexual penetration means any contact, however slight, between the sex organ or anus of one person and an object." When asked if defense agreed to the instruction, defense counsel responded, "[t]hat is the definition. I have no objection." This instruction was ultimately tendered to the jury.

¶ 61    In closing arguments, the State told the jury, "[s]exual penetration means any contact, any contact however slight, between the sex organ of one person and an object. Now, make no mistake defendant's finger is an object." Defendant did not object to this comment.

¶ 62    After deliberating, on September 1, 2022, the jury returned a guilty verdict on both counts.

¶ 63    On October 4, 2022, defendant filed a motion for judgment notwithstanding the verdict (JNOV) or in the alternative for a new trial. On October 27, 2022, a hearing was held, and the trial court denied the motion. Afterward, defendant moved to file a *pro se* motion for new trial on the grounds of ineffective assistance of counsel.

¶ 64    On November 4, 2022, a *Krankel* hearing was held on defendant's *pro se* motion. Defendant's motion raised 28 claims of error. Among these was the claim that defendant received ineffective assistance of counsel when counsel failed to object to the introduction of the erroneous instruction on sexual penetration. On this point, trial counsel conceded error. Following the *Krankel* inquiry, the trial court found that trial counsel was not ineffective and denied the request for appointment of conflict counsel.

¶ 65    Following the *Krankel* hearing, defendant's trial counsel withdrew, and defendant retained new counsel to represent him at sentencing. On January 4, 2023, defendant, through his newly retained counsel, filed a motion to reconsider the denial of defendant's motion for JNOV and new trial, raising several claims of ineffective assistance of counsel.

¶ 66    On January 13, 2023, the trial court denied defendant's motion to reconsider and sentenced defendant to 18 years' imprisonment.

¶ 67    Defendant timely appealed.

¶ 68                                    II. ANALYSIS

¶ 69    Defendant raises several issues on appeal. His foremost contention is (A) that the trial court committed reversible error when it improperly instructed the jury on the definition of sexual penetration. Defendant also argues that (B) the trial court erred when it failed to appoint conflict-free counsel after trial counsel admitted error at the *Krankel* hearing, (C) the State failed to prove him guilty beyond a reasonable doubt, (D) the court erred in admitting A.S.'s out of court statements, (E) the court erred in allowing Sharp to testify that he arranged for A.S. to be interviewed by the CAC, and (F) the court erred when it did not allow defendant to recross-examine witnesses.

¶ 70                          A. Improper Jury Instructions Warrant Reversal

¶ 71    Defendant argues that his conviction should be reversed because the jury was improperly instructed on the definition of sexual penetration. "The question of whether a jury instruction is legally correct is reviewed *de novo*." *People v. Tompkins*, 2023 IL 127805, ¶ 42. As a preliminary matter, defendant acknowledges that trial counsel failed to object to the proposed jury instruction at trial and argues that we should review the matter as either plain error or ineffective assistance of counsel. The State maintains that defendant invited the error by acquiescing to the jury instruction, and thus forfeited plain error review.

¶ 72    We agree with the State that defendant invited the error when trial counsel acquiesced to the State's proposed instruction. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). The doctrine of invited error extends not only to procedures in which a party acquiesces, but also to instances where a party affirmatively states that they have no objection. See *People v. Bush*, 214 Ill. 2d 318, 332 (2005) ("[W]hen a defendant procures, invites, or acquiesces in the admission of evidence, even though the evidence is

improper, she cannot contest the admission on appeal."); *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989) ("[W]here, as here, a party acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby."); *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 54 (defense counsel invited error by affirmatively answering that he had no objection to the admission of the State's exhibit); *People v. Cox*, 2017 IL App (1st) 151536, ¶ 76 ("When the defense invited the trial court to admit the certificate by affirmatively responding to the trial court's questions that it had no objection to its admission, we cannot find any error by the trial court."). When asked if the defense had any objection to the instruction at issue, trial counsel answered, "[t]hat is the definition. I have no objection." By doing so, he invited the erroneous instruction.

¶ 73    "Where the defendant invited the error, our supreme court has declined to address any related plain-error claim." *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 77 (citing *People v. Patrick*, 233 Ill. 2d 62 (2009)). However, invited error does not preclude a defendant from raising a claim of ineffective assistance of counsel on the same issue. See *People v. Villarreal*, 198 Ill. 2d 209, 227-28 (2001) (addressing claim of ineffective assistance in submitting verdict forms after finding invited error precluded directly attacking the forms on appeal); *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 210 ("The doctrine of invited error blocks defendant from raising this issue on appeal, absent ineffective assistance of counsel."); see also *People v. Wilson*, 2022 IL App (5th) 190377, ¶ 39; *People v. Chrisman*, 2022 IL App (2d) 210530-U, ¶ 32.

¶ 74    To assert a claim of ineffective assistance of counsel, a defendant must establish that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy either prong precludes a

finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 34.

¶ 75    Turning to the first prong of the analysis, we first consider whether the given jury instruction was legally correct. Defendant was charged with two counts of predatory criminal sexual assault of a child, alleging that he placed his fingers in A.S.'s anus and vagina. A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, the victim is under 13 years of age, and the person commits either "an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration[.]" 720 ILCS 5/11-1.40 (West 2018). Defendant had been found not guilty on charges based on an act of contact for the purposes of sexual gratification following his first trial. The remaining charges were based on the commission of "an act of sexual penetration." Sexual penetration is defined as, "any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration." *Id.* § 11-0.1.

¶ 76    Our supreme court has made it clear that for the purposes of the "contact" clause of the definition, "object" does not include body parts. *People v. Maggette*, 195 Ill. 2d 336, 350 (2001). ("[W]e conclude that the word 'object' in the 'contact' clause of the statutory definition of sexual penetration was not intended to include parts of the body."). The indictment did not charge defendant with touching A.S.'s vagina or anus with anything other than his hand or fingers, nor were there any such allegations at trial. As defendant is alleged to have touched A.S.'s vagina and anus only with his hands, he may be found guilty under only the "intrusion" clause.

¶ 77    The instruction the jury received read, "[t]he term sexual penetration means any contact,

however slight, between the sex organ or anus of one person and an object." Further, during closing argument, the State told the jury, "[s]exual penetration means any contact, any contact however slight, between the sex organ of one person and an object. Now, make no mistake defendant's finger is an object." This was not a legally correct statement of the law, and the jury should have been instructed on the "intrusion" clause.

¶ 78     "In demonstrating, under the first *Strickland* prong, that his counsel's performance was deficient, a defendant must overcome a strong presumption that, under the circumstances, counsel's conduct might be considered sound trial strategy." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). In the instant case, the erroneous instruction made it easier to convict defendant, requiring the State to show merely that defendant touched A.S.'s vagina or anus with his finger, instead of committing an act of intrusion, and was therefore deficient.

¶ 79     Turning to the second prong, a defendant may demonstrate prejudice by showing that counsel's deficient performance rendered the result of the trial unreliable or the proceedings fundamentally unfair. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). "Fundamental fairness requires the trial court to give correct instructions on the elements of the offense in order to insure a fair determination of the case by the jury." *People v. Williams*, 181 Ill. 2d 297, 318. Prejudice is presumed to exist when the jury instructions contain an error regarding an essential element of the offense. *People v. Hartfield*, 2022 IL 126729, ¶ 59. Where such an error is present, "the jury cannot perform its constitutional function." *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977).

¶ 80     The facts of the instant case are closely mirrored by those of *People v. James*, 331 Ill. App. 3d 1064 (2002) and *People v. Hobbs*, 2022 IL App (4th) 210471-U. In both *James* and *Hobbs,* the defendants were found guilty of predatory criminal sexual assault of a child based on allegations that they touched a minor's vagina with their fingers. *James*, 331 Ill. App. 3d at 1065; *Hobbs*, 2022

IL App (4th) 210471-U, ¶ 5. In both cases, the jury was instructed on the contact clause, rather than the intrusion clause, of sexual penetration, which defense counsel did not object to. *James*, 331 Ill. App. 3d at 1068; *Hobbs*, 2022 IL App (4th) 210471-U, ¶ 27. After reviewing the erroneous instructions for plain error, both cases concluded that the improper instruction presented an issue of fundamental fairness and constituted plain error. *James*, 331 Ill. App. 3d at 1068-69; *Hobbs*, 2022 IL App (4th) 210471-U, ¶ 27.

¶ 81     We join *James* and *Hobbs* in concluding that the erroneous instruction in this case rendered the proceedings fundamentally unfair and conclude that defendant received ineffective assistance of counsel. Accordingly, defendant's convictions must be reversed.

¶ 82     We likewise join *James* and *Hobbs* in expressing our utter bewilderment at the error displayed. See *James*, 331 Ill. App. 3d at 1069 ("We do not understand why the prosecutor would propose a modified instruction that affirmatively misstated the law. We do not understand why defense counsel did not object. We do not understand why the trial court gave an instruction that was contrary to our decision in *Maggette*."); *Hobbs*, 2022 IL App (4th) 210471-U, ¶ 31("We find this case just as bewildering and conclude, unfortunately, that it merits the same outcome as *James*.") While it is ultimately "the fault of the trial court, whose duty it is to give the jury proper guidance[,]" *Jenkins*, 69 Ill. 2d at 66, the parties share some blame as they are obliged to prepare proposed instructions. Ill. S. Ct. R. 451 (eff. Apr. 8, 2013). Despite trial counsel's argument that he reviewed the IPI and "it didn't appear to directly say that a finger is not an object, and object is not a finger[,]" the IPI instructions have contained a committee note on *Maggette* since at least December 8, 2011, when they were first posted online.

¶ 83          B. The Matter of Whether to Appoint Conflict Counsel is Moot

¶ 84    Defendant argues that the trial court erred in not appointing conflict counsel following the *Krankel* hearing. As we have already found that defendant received ineffective assistance of counsel warranting reversal, the matter is moot.[1]

¶ 85                           C. The Evidence was Sufficient

¶ 86    Defendant argues that the state failed to prove him guilty beyond a reasonable doubt. "Due process requires proof beyond a reasonable doubt in order to convict a criminal defendant." *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Although, we have found that reversal is warranted based on violation of defendant's right to effective assistance of counsel, as defendant challenged the sufficiency of the evidence, we must address the claim to ensure there is no double jeopardy impediment to a new trial. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008); *c.f. Patrick*, 233 Ill. 2d at 76 (2009) ("We note that [the defendant] has not argued the evidence in this case was insufficient to convict him. Thus, there is no double jeopardy impediment to a new trial.").

¶ 87    "When presented with a challenge to the sufficiency of the State's evidence, a reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted. Emphasis in original.) *Ross*, 229 Ill. 2d at 272.

¶ 88    As charged, to find defendant guilty of predatory criminal sexual assault of a child, the state needed to show that, at the time of the offense, defendant was over 17 years old, A.S. was under 13 years old, and that defendant committed an act of intrusion, however slight, of his finger

---

[1]Additionally, defendant's new counsel did raise several claims of ineffective assistance of counsel in defendant's motion to reconsider the denial of his motion for JNOV.

into A.S.'s sex organ or anus. The ages of defendant and A.S. were sufficiently established, and defendant is challenging only the sufficiency of the evidence regarding penetration.

¶ 89    Defendant argues that "there was no physical evidence, no confession, and no direct testimony of penetration." First, we reject defendant's contention that the evidence was insufficient because there was no confession or physical evidence. There is no requirement that the State provide physical evidence corroborating a complainant's testimony (*People v. Parker*, 2016 IL App (1st) 141597, ¶ 30), and there is certainly no requirement that the State produce a confession.

¶ 90    As for testimony regarding penetration, there was not only A.S.'s trial testimony, but also the out of court statements made to Laura, Synove, and Maki. A.S. testified that defendant touched the "outside" of her vagina. Regarding her anus, A.S. testified that defendant touched "maybe inside" and said, "I think it was on the inside, but I don't really know if it was on the inside." Laura and Synove both testified that A.S. expressed that she was in pain because defendant had touched her "privates." Maki likewise reported that A.S. said defendant was "mean" and touched her "private parts." Laura also reported that A.S.'s vagina and clitoris were red and swollen. Laura additionally testified that she observed A.S. masturbating by running her hand across her vagina, and saw A.S. placed her finger in her anus stating, "that's the way [defendant] put his finger in my butt and vagina."

¶ 91    Regarding the allegation that defendant penetrated A.S.'s anus, her direct testimony, though not entirely definite, was that defendant placed his finger inside her anus. This was corroborated by Laura's testimony. Accordingly, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶ 92    Regarding the allegation that defendant penetrated A.S.'s vagina, "sexual penetration is

not limited to an intrusion, however slight, of the vagina; the female sex organ also includes the labia majora and the labia minora." *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 71. Further "a jury may reasonably infer penetration based on testimony that a defendant 'rubbed,' 'felt,' or 'handled' the victim's vagina, and this inference is unreasonable only if the victim denies penetration[.]" *Id.* (citing *People v. Hillier*, 392 Ill. App. 3d 66, 69 (2009)). Similarly, testimony that a defendant "touched" and "poked" the victim's vagina in conjunction with the use of the words "hurts," "puts," and "would put" has been found sufficient evidence from which a reasonable jury could infer sexual penetration by the defendant's finger. *People v. Foster*, 2020 IL App (2d) 170683, ¶¶ 32-36; see also *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶¶ 46, 49 (victim's testimony that the defendant was "rubbing and pressing down" with his thumbs against the victim's labia majora was sufficient to establish sexual penetration).

¶ 93 Considering the totality of the circumstances, even though A.S. testified that defendant touched the "outside" of her vagina, taken alongside A.S.'s complaints of pain, Laura's observation that A.S.'s vagina was red and swollen, and A.S.'s demonstration to Laura of how defendant "put his finger in my butt and vagina," there was sufficient evidence from which a jury could infer that defendant had penetrated A.S.'s sex organ with his finger.

¶ 94 Accordingly, there was sufficient evidence to convict defendant of the charged offenses, and thus no double jeopardy impediment to retrial.

¶ 95 D. The Trial Court did not Err in Admitting A.S.'s Out of Court Statements

¶ 96 Defendant challenges the admission of A.S.'s out of court statements under section 115-10 of the Code (725 ILCS 5/115-10 (West 2020)). As the admissibility of this evidence is relevant to the cause on remand, we consider the merits of this issue. A trial court's decision to admit a child victim's out of court statements under section 115-10 of the Code will not be reversed absent an

abuse of discretion. *People v. Williams*, 193 Ill. 2d 306, 343-44 (2000). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 97    In order to admit an out-of-court statement made by a child sex abuse victim under section 115-10, the trial court must first hold a hearing to determine whether the time, content, and circumstance of the statement provide sufficient safeguards of reliability. 725 ILCS 5/115-10(b)(1) (West 2020). A list of non-exclusive factors to be considered include spontaneity and consistent repetition; mental state of the declarant; use of terminology unexpected of a child of similar age; lack of motive to fabricate; the child's physical condition; "the nature and duration of the sexual act; the relationship of the child and the accused; reaffirmance or recantation; whether the child is likely, apart from the incident, to have sufficient knowledge of sexual matters to realize the act is possible and sexually gratifying to some; whether the language is embarrassing and, therefore, only spoken if true; and whether it was a cry for help." *People v. Jahn*, 246 Ill. App. 3d 689, 701 (1993).

¶ 98    Defendant maintains that while the trial court excluded the second CAC interview as not reliable, because A.S. had been exposed to adult intervention, the trial court erred in not excluding the other four hearsay statements, which defendant argues were also influenced by adult intervention. Defendant maintains that the first CAC interview introduced adult intervention, rendering all successive statements unreliable. Further defendant argues that it was never established when the alleged abuse occurred, so there was no way to determine the closeness in time of the statements to the alleged abuse.

¶ 99    Many of defendant's arguments are predicated on the notion that A.S.'s statements were

made after adult intervention, and in support, defendant cites our supreme court's decision in *People v. Zwart*, 151 Ill. 2d 37 (1992). However, *Zwart* does not stand for the proposition that adult intervention necessarily renders a child victim's statements unreliable. In *Zwart*, the trial court admitted statements that the three-year-old victim made to her mother and therapist, with the earliest statement occurring around five weeks after the alleged abuse occurred. *Id.* at 41. In that time the victim had been interviewed by a police officer, a DCFS worker, and a hospital counselor, and the State presented no evidence regarding the substance of these interviews. *Id.* at 44-45. Further, the victim was found not competent to testify and thus unavailable to be cross-examined. *Id.* at 45. Our supreme court ultimately found that the trial court abused its discretion in admitting the statements because, (1) the victim's age made her susceptible to suggestion from outsiders; (2) defendant was unable to question the victim regarding the prior interviews because she was found incompetent to testify; (3) because no evidence regarding the substance of those interviews had been presented it was impossible to determine whether the victim's precocious knowledge of sexual activity was due suggestive interview techniques or if she was encouraged to accuse defendant; and (4) the victim only admitted that abuse occurred and implicated the defendant after the three interviews. *Id.* at 45-46. Accordingly, *Zwart* does not stand for the proposition that *any* adult intervention renders a statement unreliable, but rather that, under the particular circumstances of that case, the undocumented adult intervention did not provide sufficient safeguards of reliability.

¶ 100    Accordingly, we reject defendant's general contention that the fact that the statements occurred following the first CAC interview rendered them an unreliable product of adult intervention, as the interview was recorded, a review of the interview reveals no suggestive questioning, and A.S. was available for cross-examination.

¶ 101  Having addressed defendant's general contentions, we examine each statement individually.

¶ 102  Defendant argues that A.S.'s December 22, 2019, statement to Laura that, "my daddy hurt me very badly in my privates[,]" should not have been admitted under section 115-10 because the State failed to show that Laura's involvement did not impact A.S.'s statement. Additionally, defendant argues that the statement should not have been admitted as an excited utterance. Defendant argues that the statement was not made at the first and most immediate opportunity for adult interaction following her visit with defendant, as her grandfather picked her up from the police station before bringing her home, and the State failed to show that A.S.'s vomiting was related to the alleged abuse or was the cause of the outcry. Nor was there evidence that the alleged abuse occurred during the visit. Likewise, Laura's observation of A.S.'s vagina being red and swollen was not corroborated by the medical professionals.

¶ 103  For the December 22, 2019, statement to Laura to be admitted under the excited utterance or spontaneous declaration exception to hearsay "(1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence." *Williams*, 193 Ill. 2d at 352. When considering admissibility under the excited utterance exception, trial courts must consider the totality of the circumstances, including the timing, nature of the event, mental and physical condition of the declarant and the presence or absence of self-interest. *Id.* "[T]he fact that a declarant's statement is made at the first opportunity to speak supports a finding of spontaneity [citation], but the exception may still be found where a declarant has spoken previously to another." *Id.* at 352-53. A statement which is volunteered also supports a finding of admissibility. *Id.* at 353 "The time factor has been described as an 'elusive'

factor, 'whose significance will vary with the facts of each case.' " *Williams*, 193 Ill. 2d 306 at 353. In instances of sexual assault of a child, the stress can remain with the child long after it occurred, and children are less likely to fabricate statements because, "(1) the child is apt to repress the incident; (2) it is often unlikely the child will discuss such a stressful incident with anyone but the mother; and (3) the characteristics of young children work to produce declarations free of conscious fabrication for a longer period after the incident than adults." *People v. Bitler*, 146 Ill. App. 3d 477, 481–82 (1986); *People v. Merideth*, 152 Ill. App. 3d 304, 318 (1987).

¶ 104    Despite defendant's arguments to the contrary, in the instant case, there is a reasonable basis to infer that some form of abuse occurred during A.S.'s December 21, 2019, visit with defendant. Laura testified that A.S. had been lethargic and in a trance like state before vomiting, and that she observed redness in A.S.'s vaginal area. This all supports the inference that A.S. had been abused sometime during her visit with defendant. The fact that A.S. had not said anything to her grandfather is consistent with the tendency of children to first disclose abuse to their mother, as Laura appears to have been A.S.'s primary maternal figure. Further, according to Laura, A.S.'s statement was volunteered by A.S. and not the result of questioning. Under the totality of the circumstances, we cannot say that the trial court abused its discretion in finding that A.S.'s statement to Laura was admissible under the excited utterance exception to hearsay.

¶ 105    Likewise, the trial court did not err in finding that A.S.'s statement was admissible under section 115-10. Despite defendant's contentions that the CAC interview and Laura may have influenced A.S, nothing about the first CAC interview demonstrated that A.S. was subjected to suggestive questioning, and both Laura and A.S. testified that Laura had not coached A.S. on what to say. Further, the record shows that the statement was made spontaneously, while under emotional and physical stress. Accordingly, we find that the trial court did not abuse its discretion

in admitting the December 22, 2019, statement to Laura.

¶ 106    Defendant next challenges the admissibility of A.S.'s statement to Synove as both a statement made by a victim to medical personal, and under section 115-10. In a prosecution for predatory criminal sexual assault of a child, "statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." 725 ILCS 5/115-13. A.S.'s statement to Synove clearly falls within this exception. Defendant maintains that the trial court erred in finding that A.S.'s statement was admissible as a statement made by a victim to medical personnel for purposes of medical diagnosis or treatment because it could not be untangled from A.S.'s prior denial and potential coaching. We reject this argument because, as previously stated, the first CAC interview did not expose A.S. to suggestive questioning, and A.S. denied having been told what to say. Additionally, the statement was spontaneous, and consistent with A.S.'s previous statement to Laura. Accordingly, the trial court did not err in admitting the statement to Synove.

¶ 107    Regarding the February 5, 2020, statement to Laura and the statement to Maki, defendant argues that the trial court erred in admitting the statements because they occurred after the second CAC interview, which the court found unreliable as potentially being influenced by adult intervention. Additionally, defendant argues that the fact that A.S. was attending counseling introduced a further source of adult intervention. We disagree. While the trial court based its denial of the motion to admit the statements made at the second CAC interview based partially on defendant's use of the word "vagina" when she previously used the word "privates," the court's primary basis for not admitting the interview was its belief that at the age of four, A.S. lacked the

capacity to "have a guilty conscience about not being honest" and therefore must have been told by someone that she had not been honest at the prior interview. Regardless of the soundness of this assessment, this factor was not present in the subsequent statements to Laura and Maki. Both statements were made spontaneously and were consistent with A.S.'s prior statements. Additionally, the fact that Laura observed A.S. placing her finger in her anus, shows conduct which would be unexpected of a child of a similar age absent sexual abuse. Accordingly, the trial court did not abuse its discretion in admitting the February 5, 2020, statement to Laura, or the statement to Maki.

¶ 108                    E. Sharp's Testimony was Appropriate

¶ 109   Defendant argues that Sharp's testimony that he set up an interview for A.S. at the CAC was "completely irrelevant and prejudicial." Further defendant maintains that Sharp's testimony created the false impression that this was the first and only interview of A.S. and that she was credible and created a run around the court's ruling that the interview was inadmissible. Defendant then goes on to suggest that the trial court "presumably allowed this narrative under the course of conduct hearsay exception." Finally, defendant argues that he had no opportunity to cross-examine the other people present at the forensic interview.

¶ 110   Defendant's argument on this point seems somewhat scattershot and barely developed. First, hearsay is an out of court statement offered for the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Sharp never testified as to any statements that were made at the CAC interview, so there was no need for a hearsay exception.

¶ 111   As for defendant's contention that Sharp's testimony made A.S. more credible, "[A] police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully

explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). Most criminal investigations will involve the preliminary step of interviewing a complaining witness and then proceeding to gather additional evidence. That bare fact does not unduly bolster the witness's credibility. Sharp described how he received a report of alleged sexual abuse, arranged to have the minor victim interviewed, met with the family, and interviewed witnesses, including defendant. At no point did he testify as to whether anyone he spoke with was credible. Defendant's assertion that disclosure of the bare fact that A.S. was interviewed and who was present somehow unduly bolstered her credibility is unsupported by citations to caselaw or common sense.

¶ 112   Accordingly, we reject defendant's contention that the trial court erred in allowing Sharp's limited testimony regarding the CAC interview.

¶ 113                      F. Trial Court's Erroneous Ban on Recross-Examination

¶ 114   Finally, defendant contends that the trial court's blanket ban on recross-examination violated his right to confront his accusers. "A criminal defendant's right to confrontation under the sixth amendment includes the right to cross-examine witnesses against him." *People v. Garner*, 2018 IL App (5th) 150236, ¶ 18. While the scope of recross-examination is within the discretion of the trial court, a blanket ban on recross-examination is an abuse of discretion. *Id.* ¶¶ 18-20. While the trial court did allow recross-examination of Laura, it made it clear that this was a one-time exception to its policy and later did not allow recross-examination of Krueger. As we are reversing on other grounds, we need not consider whether defendant was prejudiced by the Court's policy in the instant case, but nevertheless denounce such policies generally.

¶ 115                              III. CONCLUSION

¶ 116   For the reasons stated, we reverse the judgment of the circuit court of McHenry County and remand for further proceedings consistent with this order.

¶ 117    Reversed and remanded.